561 A.2d 1038

**Michael T. McDERMOTT**

**v.**

**David Eugene HUGHLEY.**

**No. 156, Sept. Term, 1987.**

Court of Appeals of Maryland.

Aug. 10, 1989.

14

Steven R. Migdal (Manis, Wilkinson, Snider and Goldsborough, Chartered, on brief), Annapolis, for appellant.

Howard L. Metz (Robert G. Samet, Ashcraft & Gerel, on brief), Rockville, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

COLE, Judge.

The basic question presented in this case is whether the reports of a mental health care professional, requested by an employer and bearing on the fitness of an employee for employment, enjoy the defense of an absolute or qualified privilege in a defamation suit. If an absolute or qualified privilege pertains, then the trial court was correct in granting summary judgment. If no such defense is available, then the trial judge erred and a trial must be conducted.

The characters giving rise to this issue we introduce in the following recitation of facts. David Eugene Hughley applied to the Maryland–National Capital Park and Planning Commission (MNCPPC) for employment as a park police officer in October of 1981. Hughley was accepted as a candidate on August 9, 1982, but was advised that before becoming an official Park Police Officer, he would have to complete candidate training school and a twelve-month probationary period. He entered the Police Academy in Prince George's County after working as a police dispatcher through November of 1982.

Having completed his training at the Academy in April of 1983, Hughley began field patrol training. He then learned that he might be transferred to a separate unit where he would be required to complete horse-mounted training. Having "no love of horses," Hughley wrote to Captain George Klotz, the commanding officer of that unit, explaining his reservations. In a subsequent meeting with Captain Klotz, he further related vivid childhood memories of falling off a pony, of an uncle's being kicked in the face by a horse, and of fellow officers sustaining knee injuries from having horses fall on them. Nonetheless, Captain Klotz did not give Hughley permission to be excused and convinced him to "try" the mounted unit. Participation in that unit, however, was optional. The Mounted Unit Recruit Training Guide Booklet provided:

> If at any time during your training you wish to stop and return to your previous position, please do so, as

there will be no hard feelings. We only want officers that are genuinely interested in riding.

On August 15, 1983, Hughley began horse-mounted training. He claimed that in the presence of horses, he became "queasy," experienced "mild stomach problems," and suffered incidents of vomiting and diarrhea. Hughley was convinced that it was his fear of horses which caused his physical reactions. After one week of training, he informed Captain Klotz that he was "uncomfortable" with his assignment. Hughley, continuing to advise other supervisors of his condition, began also to experience leg, back, and hip pain from riding horses. His condition prompted him to seek medical help at his group health association (GHA) from Dr. Gary Jones. Still unable to convince Captain Klotz to excuse him from the horse-mounted training unit, Hughley consulted Dr. Ann L.B. Williams, also a GHA physician. Dr. Williams consulted a psychiatrist concerning Hughley and on September 7, 1983, wrote a letter to MNCPPC recommending that Hughley be excused from horse-mounted training because he experienced "severe anxiety reaction when around horses."

On September 12, 1983, Lt. Robert Fox of the mounted unit summoned Hughley to his office. After discussing Hughley's problem, Lt. Fox ordered Hughley to see Michael T. McDermott, Ph.D., a psychologist. Two days later, Fox telephoned Hughley and advised him to report to a pre-arranged appointment with McDermott that evening.

McDermott was under contract with MNCPPC to act as consultant and to provide counselling and referral services for employees needing help resolving work-affecting emotional problems. The two met on September 14, 1983, for approximately thirty minutes.

Hughley proceeded to describe to McDermott the entire scenario of his horse-related phobia and his physical reactions when around horses. He told McDermott that Captain Klotz continued to insist on his participation in the mounted unit and that fellow officers referred to the Cap-

tain's methods as "Gestapo tactics." At the conclusion of that interview, McDermott told Hughley that he believed that Hughley's phobia of horses was not feigned and that he would recommend his transfer from the mounted training unit. However, Lt. Colonel Donald R. Leslie, Sr. of the MNCPPC had told McDermott that if Hughley did not ride, Hughley would be fired.

McDermott thereupon urged Hughley to undergo hypnosis to treat the phobia, but Hughley refused. McDermott persisted in recommending hypnosis and Hughley replied, "you are the psychiatrist, you can recommend anything you want to." McDermott responded, "I will do that, then.... They told me you had an authority problem but I don't think you have one, I don't think you are abnormal." McDermott reminded Hughley that the results of the meeting would not remain confidential but must be reported to MNCPPC. McDermott did, however, agree to provide Hughley a copy of his diagnosis.

On September 29, 1983, Hughley was ordered to appear at a meeting before Major Richard Belt of MNCPPC, at which Larry Brownlee of the Fraternal Order of Police [1] and McDermott also were present. McDermott began by confirming his belief that Hughley's phobia was real. He next stated that he and Hughley had agreed that Hughley would submit to hypnosis to treat his problem. Hughley then interrupted claiming that he had not in fact agreed to hypnosis. An argument ensued between Hughley and McDermott, and the meeting quickly disintegrated. McDermott then told Hughley that it was necessary for him to sign a release for McDermott's lawyers. That release, entitled "Consent for Release of Confidential Information", as completed and signed by Hughley provided:

> I do hereby authorize Michael T. McDermott, Ph.D to disclose to Major Belt the following information: Diagnosis and Recommendation for the purpose of suitability for mounted training.

---

1. Brownlee attended at Hughley's request.

On October 4, 1983, McDermott wrote the following letter to Major Belt:

At the request of Lt. Fox I conducted an evaluation of POC David Hughley on September 22, 1983. As an outcome of this evaluation, a meeting was scheduled with you and Mr. Hughley on September 29, 1983. The purpose of these meetings was to determine if POC Hughley suffers a phobic reaction to horses which prevents him from receiving training in the Mounted Unit.

It is my opinion based on the session with Officer Hughley and conversation with other officers that no such phobic reaction exists and the symptoms of anxiety (stomach cramps) are presentations of false and grossly exaggerated symptoms. The symptoms appear to be produced to avoid working in the Mounted Unit and specifically to avoid working under the command of Captain Klotz. In a word this is termed "malingering." Most notable in the process of arriving at this diagnosis was POC Hughley's lack of cooperation with the evaluation and prescribed treatment regimen.

I will supply you with a full detailed explanation of these findings in the near future. If I can be of further assistance in this matter, please feel free to call me.

Hughley alleges that this letter was written in retaliation for the embarrassment experienced by McDermott at the September 29, 1983, meeting. McDermott again met with Major Belt on October 4 to discuss this report. The meeting also was attended by Roy Hedgepeth, Employee Relations and Development Manager; Lt. Col. Donald R. Leslie, Sr., Division Commander, Prince George's County; Mr. Wool, legal counsel; Captain Klotz; and Major Belt. Hughley was not invited to participate.

On October 22, 1983, McDermott sent the supplemental letter, as he had promised, to Major Belt. McDermott wrote:

This report will elaborate on my letter of October 4, 1983 regarding POC Hughley in which I reported my findings

that he was "malingering" in regard to work on the Mounted Unit.

I met with POC Hughley at my private office on September 22, 1983 at the request of Lt. Fox. In his communication with me Lt. Fox indicated that POC Hughley was being sent to me because he had developed a sudden and severe phobic response to horses. Lt. Fox also indicated that POC Hughley had been riding horses for over two weeks when the symptoms occurred and there was some concern that the onset of symptoms was a scheme on POC Hughley's part to get out of the Mounted detail. In my meeting with POC Hughley he came across as quite anxious, deferential, and eager to please. He detailed the severe stomach cramps he developed around horses and communicated the diagnoses of his doctor at GHA. He could not explain why initially he had been able to ride horses without experiencing such symptoms. Throughout the interview he repeatedly remarked how difficult it was to work for Capt. Klotz because of the Captain's disciplined approach to training and running the unit. Often these comments were quite bitter, referring to the Captain as the equivalent of a "Nazi." He also stated that riding was "hard work" (physically taxing) and that it left him quite tired. Upon further exploration of these issues with POC Hughley it surfaced that his stomach cramps first emerged when he was ordered to clean the stables. Repeatedly he told me of the instances where he had to go home sick and in each case prior to the onset of cramps there was a direct order from a superior officer. I told POC Hughley that I thought his problem was more related to authority figures than horses, which he denied. So I invited him to participate in one of two psychotherapy programs which have proven extremely effective in the treatment of phobias (either hypnotherapy or systematic desensitization). POC Hughley agreed to pursue the hypnotherapy program and I told him I would talk to his superiors about this plan to resolve the horse phobia problem.

On September 27, 1983, as you recall Major, I met with you and outlined the treatment plan for POC Hughley and proposed how his pursuit of treatment could be used to settle the matter. If he went for treatment and it was not helpful he would not continue with Mounted Training, however, his participation in treatment would let us know that he was serious in his attempt to resolve this matter. After the interview I spoke with three officers from the Mounted Unit. In private conversation each of them indicated that they thought POC Hughley was "faking it" because he did not like the Unit nor the Unit commander and had voiced this sentiment quite frequently.

On September 29, 1983 POC Hughley, FOP Representative Brownlee, and I met with you to resolve this matter and discuss treatment. In this meeting Hughley refused treatment and denied that he had agreed to it in my earlier meeting with him. In fact his entire tone had changed from one of deference to open hostility, excitability, and tension. He argued vociferously with me about the treatment and lied outright about our reaching an agreement. He was also quite argumentative about the condition of his employment although I was not trying to discuss that with him. When I told him he was undoing the agreement we had reached, he concurred and said that he would not honor that agreement.

Based on his irascible mood, refusal to cooperate in any way to alleviate this situation at the Mounted Unit other than to be removed, the symptomatology occurring only when given an order, and his stated dislike of the Unit commander, I was forced to conclude that this was not a bona fide phobia but a manipulation to get out of a work assignment he did not like.

Beyond the issues involved in this incident, one must speculate on the viability of such an officer to be relied upon in the future to follow orders and deal with your organization in a forthright and honest manner. I would also question his ability to deal with authority in an orderly way and become a contributing member of the

force. To date his actions have been a severe drain on all involved from supervisory personnel to fellow officers. The manipulations he demonstrated indicate there may be more pathological character issues involved here than just contempt for superiors. Other than with criminal elements, I have not seen an individual lie so boldly or so vehemently when to cooperate or to be truthful would only be in his best interest. In sum, one must wonder about his ability to be a police officer and carry out that task responsibly and honestly.

In summary I find that POC Hughley does not suffer from a phobia to horses which prevents his working in the Mounted Unit. I did find that he was trying to avoid working in the unit and specifically avoiding the command of Capt. Klotz. His exaggerated symptoms are false presentations aimed at reassignment.

If I can be more detailed or of further assistance in this matter, please call me.

On October 18, 1983, Hughley received notification of MNCPPC's intention to fire him, and he officially was terminated on December 2, 1983.

Hughley brought suit in the Circuit Court for Prince George's County on October 4, 1984, alleging one count of libel and slander. The circuit court (Woods, J.) granted McDermott's motion for summary judgment. The Court of Special Appeals vacated that judgment, *Hughley v. McDermott*, 72 Md.App. 391, 530 A.2d 13 (1987), and remanded the case for further proceedings. We granted McDermott's petition for a Writ of Certiorari.

McDermott urges us to agree that the reports of October 4 and 22, 1983, containing the purported defamatory statements enjoy an absolute privilege and therefore are non-actionable or that they are conditionally privileged as a result of the alleged actual and implied consent of David Hughley. McDermott contends that as of September 14, 1983, the date of their first appointment, Hughley knew that McDermott would report his diagnosis and recommendations re-

garding the alleged phobia to Hughley's superiors. McDermott also posits that by participating in that interview, Hughley thereby gave his implied consent, and that by requesting a copy of the reports and by signing the release on September 29, 1983, Hughley gave his express consent to the publication of the contents. Arguing that a vital public interest exists in having mental health care professionals determine, in administrative proceedings, the fitness for duty of police organization employees, McDermott maintains that such freedom to report should be unfettered by any inquiry into the professional's purpose or motive; thus, such reports should be absolutely privileged. McDermott argues that the doctrine of absolute privilege should be extended from the immunity afforded statements made during judicial proceedings to administrative proceedings as well. Furthermore, McDermott asserts that in the absence of evidence of actual malice, a qualified privilege insulates the allegedly defamatory statements. Finally, McDermott describes the contested statements as pure opinions and therefore not actionable. Thus, McDermott contends, summary judgment was proper. We disagree and explain.

Our cases make indelibly clear that at a hearing on a motion for summary judgment, the trial judge's role is not to decide the merits of the case but rather to determine whether any material facts are in dispute. Summary judgment should be granted only when pre-trial documents demonstrate that no such dispute exists and that the moving party is entitled to judgment as a matter of law.

In reviewing a motion for summary judgment, an appellate court primarily should consider whether or not a factual issue exists, and in so doing should resolve all inferences against the party making the motion. *Beard v. American Agency,* 314 Md. 235, 246, 550 A.2d 677 (1988); *Keesling v. State,* 288 Md. 579, 590, 420 A.2d 261 (1980); *Berkey v. Delia,* 287 Md. 302, 304–05, 413 A.2d 170 (1980); *Peck v. Baltimore County,* 286 Md. 368, 410 A.2d 7 (1979); *Honaker v. W.C. & A.N. Miller Dev. Co.,* 285 Md. 216, 401 A.2d

1013 (1979); *Dietz v. Moore*, 277 Md. 1, 4–5, 351 A.2d 428 (1976).

It is also firmly established that written or oral communications, otherwise libelous *per se,* for reasons of public policy may be either absolutely or qualifiedly privileged. *Miner v. Novotny,* 304 Md. 164, 167–68, 498 A.2d 269 (1985); *Orrison v. Vance,* 262 Md. 285, 292, 277 A.2d 573 (1971). In *DiBlasio v. Kolodner,* 233 Md. 512, 522, 197 A.2d 245 (1964), we explained the difference:

> [a]n absolute privilege is distinguished from a qualified privilege in that the former provides immunity regardless of the purpose or motive of the defendant, or the reasonableness of his conduct, while the latter is conditioned upon the absence of malice and is forfeited if it is abused. [Citations omitted.]

There exists a sound basis for granting certain publications an absolute privilege against all defamation claims. The common law makes a practical judgment to allow for mistakes in the accuracy of reported statements believed to be true by the speaker, particularly where the failure to make such allowances "would unduly hinder important speech, and would discourage many from publishing the disparaging truth about others for fear of being unable to prove it." Prosser and Keeton, *The Law of Torts,* § 114 (1984). Otherwise actionable conduct thus is protected where the accused acts in furtherance of a recognized socially important interest. That interest outweighs the right of the person defamed to recover for injury to his reputation. Prosser, *Torts,* § 114. This Court has recognized the existence of an absolute privilege most notably with respect to judges, attorneys, parties, and witnesses who publish defamatory material during the course of a "judicial proceeding". *Gersh v. Ambrose,* 291 Md. 188, 192, 434 A.2d 547 (1981); *Adams v. Peck,* 288 Md. 1, 415 A.2d 292 (1980); *Korb v. Kowaleviocz,* 285 Md. 699, 701–04, 402 A.2d 897 (1979). The underlying rationale for applying the privilege in this context is to protect the participants in the proceeding from the annoyance of suit and to assure that

they can perform their respective functions without harassment or intimidation. *Gersh v. Ambrose, supra,* 291 Md. at 192, 434 A.2d 547. The absolute privilege granted in judicial proceedings therefore is necessary to the proper administration of justice in the quest for the truth. *Adams v. Peck, supra,* 288 Md. at 5, 415 A.2d 292.

Qualified immunity has been granted generally to comments or criticisms as to matters of public interest related to public figures or concerning the official conduct of public officials, provided the statements are made without actual malice. *A.S. Abell Co. v. Barnes,* 258 Md. 56, 58–59, 265 A.2d 207 (1970); *see Capital–Gazette Newspapers, Inc. v. Stack,* 293 Md. 528, 445 A.2d 1038, *cert. denied, Stack v. Capital–Gazette Newspapers, Inc.,* 459 U.S. 989, 103 S.Ct. 344, 74 L.Ed.2d 384 (1982). Absolute privilege is afforded to comments made with respect to judicial proceedings, legislative proceedings, and to the activities of a limited number of high ranking executive officers. *Miner v. Novotny, supra,* 304 Md. at 168, 498 A.2d 269 (absolute privilege of witness' testimony extends to documents filed or prepared for use in pending judicial proceedings); *Keys v. Chrysler Credit Corp.,* 303 Md. 397, 494 A.2d 200 (1985) (privilege extends to post judgment proceedings); *Maurice v. Worden,* 54 Md. 233, 254, 39 A. 384 (1880) (reluctance of Maryland courts to extend absolute privilege beyond official communications to the heads of government and between departments). Finally, this court has granted the privilege to citizens rendering complaints against police officers involving the performance of official duties. *Miner v. Novotny, supra,* 304 Md. at 168, 498 A.2d 269.

McDermott contends that this Court has intimated a willingness to extend the absolute privilege doctrine in cases involving not "judicial" but certain administrative proceedings. He finds apparent credence for that proposition in *Gersh v. Ambrose, supra,* 291 Md. 188, 434 A.2d 547, where we said that "whether absolute witness immunity will be extended to any administrative proceeding will have to be decided on a case-by-case basis and will in large part

turn on two factors: (1) the nature of the public function of the proceeding and (2) the adequacy of procedural safeguards which will minimize the occurrence of defamatory statements." 291 Md. at 197, 434 A.2d 547. McDermott posits that here there was an ongoing administrative investigation at MNCPPC to determine whether Hughley should be excused from mounted training or whether he should be disciplined. McDermott perceives the "administrative investigation" as having sufficient procedural safeguards to justify extending absolute privilege.[2]

█ At this stage of the case, McDermott has not sufficiently demonstrated the nature of the public function served by the proceeding. Although he asserts the importance to the public of having mental health care professionals render unfettered diagnoses particularly where a police officer is involved, McDermott has not referred us to any

---

2. In *Gersh, supra*, 291 Md. at 194 n. 2, 434 A.2d 547 we noted examples of administrative proceedings not giving rise to absolute privilege:

E.g., *Hackethal v. Weissbein*, 24 Cal.3d 55, 154 Cal.Rptr. 423, 592 P.2d 1175 (1979) (proceedings before judicial commission of private medical society not an official proceeding authorized by law; no legal requirement that witnesses take an oath therefore no threat of perjury); *Blakeslee & Sons v. Carroll, supra*, [64 Conn. 223, 29 A. 473 (1894)] (investigating committee had no judicial office; and its decisions and subpoenas were unenforceable, the testimony non-compellable); *Mills v. Denny*, 245 Iowa 584, 63 N.W.2d 222, 40 A.L.R.2d 933 (1954) (city council proceedings not under able and controlling influence of learned judge who may reprimand, fine, punish, and expunge impertinent material from record); *Bienvenu v. Angelle, supra*, [254 La. 182 n. 1, 223 So.2d 140 (1969) (*overruled by Gonzales v. Xerox Corp.*, 320 So.2d 163 (La.1975))] (statements to Civil Service investigator not under oath, not subject to sanctions); *Mundy v. Hoard*, 216 Mich., 478, 185 N.W. 872 (1921) (irrelevant hearsay statements made by voluntary witness before hearing of city police committee not absolutely privileged); *Elder v. Holland*, 208 Va. 15, 155 S.E.2d 369 (1967) (not all administrative proceedings warrant absolute privilege; superintendent of State police lacked subpoena power; uncertain whether witnesses subject to perjury; no evidentiary rules followed); *Engelmohr v. Bache*, 66 Wash.2d 103, 401 P.2d 346, *cert. dismissed*, 382 U.S. 950, 86 S.Ct. 431, 15 L.Ed.2d 463 (1965) (proceeding before study group appointed by S.E.C. merely investigatory hearing not conducted in manner essential to constitute quasi-judicial administrative proceeding).

portion of the record confirming that an official administrative investigation in fact even was instituted. McDermott also directs our attention to *Adams v. Peck, supra,* 288 Md. 1, 415 A.2d 292, where a father engaged in a child custody battle sued for defamation one of the mother's key witnesses, a psychiatrist who prepared a report finding that the father had abused one of the children and needed psychiatric treatment. In that case, we granted the psychiatrist's report absolute privilege because it was a document prepared for possible use in connection with a pending judicial proceeding. 288 Md. at 8, 415 A.2d 292. McDermott points to no facts demonstrating that the MNCPPC solicited McDermott's report as part of or directly related to a "pending" judicial proceeding.

In any event, there seem to be insufficient procedural safeguards present. The meeting among Hughley, his supervisor, and McDermott was more in the nature of a status conference designed to assess McDermott's progress in diagnosing Hughley's problem. There was no legally cognizable tribunal administering the proceeding; there was no public hearing adversary in nature; no compellable witnesses were sworn or cross-examined; no reviewable opinion or analysis was generated; and, most significantly, Hughley did not have the opportunity to present his side of the story. *See Gersh, supra,* 291 Md. at 196, 434 A.2d 547. Without implying either that the above is a complete listing of factors or that each of the listed factors is always required, we hold that this "administrative investigation" did not rise to the minimum level necessary to constitute the adequate procedural safeguards as outlined in *Gersh.* Thus, McDermott's statements are not absolutely privileged as part of an "administrative investigation," and he is not entitled to summary judgment on that ground.

McDermott contends also that his report should be absolutely privileged since Hughley consented to its publication to his superiors by signing the "Consent for Release of Confidential Information," by participating in the interview of September 14, 1983, and by requesting a copy of the

report. McDermott cites several cases to support his theory. *See, e.g., Williams v. School District of Springfield R–12,* 447 S.W.2d 256 (Mo.1969), overruled on other grounds, *Bass v. Nooney Co.,* 646 S.W.2d 765 (Mo.1983); *Mick v. American Dental Assn.,* 49 N.J.Super. 262, 139 A.2d 570 (1950); *Lee v. Paulsen,* 273 Or. 103, 539 P.2d 1079 (1975); *Costa v. Smith,* 43 Colo.App. 251, 601 P.2d 661 (1979); *Johnson v. City of Buckner,* 610 S.W.2d 406 (Mo. App.1980).

██ Those cases rely primarily on the Restatement (Second) of Torts, § 583 (1977) view that consent is a complete defense to an action for defamation. Comment d to § 583 explains:

> It is not necessary that the other know that the matter to the publication of which he consents is defamatory in character. It is enough that he knows the exact language of the publication or that he has reason to know that it may be defamatory.

Although that Restatement section heretofore has not been adopted as the law of this State, we acknowledge its wisdom today. One who invites the publication knowing that its contents may damage his reputation cannot complain when his fears come true. While consent is a defense to a defamation action, it seems to us that whether Hughley had reason to anticipate that McDermott's report might be defamatory, and whether consent in fact was given, were properly questions for a jury's consideration.

██ At the initial meeting between the parties on September 14, 1983, McDermott explicitly told Hughley, "I don't think you are abnormal" and that he believed Hughley's phobia of horses was not feigned and he would recommend his transfer out of the unit. Furthermore, at the outset of the September 29, 1983, meeting at MNCPPC McDermott confirmed his belief that Hughley's phobia was legitimate. McDermott argues, however, that he reconsidered his original diagnosis. Thus, whether Hughley reasonably should have been aware that McDermott's report

might be defamatory, and if so would have signed the consent form is another jury question. Hughley maintains that he fully expected McDermott to convey to the MNCPPC the originally promised favorable report. Therefore, we conclude that there is a dispute as to a material issue of fact, and summary judgment should not have been granted.

We turn next to McDermott's contention that his report enjoyed a qualified or conditional privilege. A qualified privilege in defamation law developed much as did the common law doctrine of absolute privilege as a means of balancing a sufficiently important interest versus the right of a plaintiff to vindicate an injury to his reputation. *Prosser, Torts,* § 115. This conditional privilege "rest[s] upon the notion that a defendant may escape liability for an otherwise actionable defamatory statement, if publication of the utterance advances social policies of greater importance than the vindication of a plaintiff's reputational interest." *Marchesi v. Franchino,* 283 Md. 131, 135, 387 A.2d 1129 (1978); *see Hanrahan v. Kelly,* 269 Md. 21, 305 A.2d 151 (1973). A statement is accorded a qualified privilege "only when the occasion shows that the communicating party and the recipient have a mutual interest in the subject matter, or some duty with respect thereto." *Simon v. Robinson,* 221 Md. 200, 206, 154 A.2d 911 (1959). Stated otherwise,

[a]n occasion is conditionally privileged when the circumstances are such as to lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that facts exist which another sharing such common interest is entitled to know.

*Hanrahan v. Kelly, supra,* 269 Md. at 28, 305 A.2d 151 (quoting Restatement of Torts § 596 (1938)).

 We have recognized numerous instances where a qualified privilege is appropriate. For example, communications arising out of the employer-employee relationship clearly enjoy a qualified privilege. *General Motors Corp. v. Piskor,* 277 Md. 165, 352 A.2d 810 (1976) (statements accusing auto assembly plant employee of theft granted

conditional privilege); *Jacron Sales Co. v. Sindorf,* 276 Md. 580, 350 A.2d 688 (1976) (statements accusing former employee of theft granted conditional privilege); *Hanrahan v. Kelly, supra,* 269 Md. 21, 305 A.2d 151 (letter charging partner with impropriety held privileged); *Peurifoy v. Congressional Motors,* 254 Md. 501, 255 A.2d 332 (1969) (statements charging car dealership employee with mismanagement held privileged); *Stevenson v. Baltimore Club,* 250 Md. 482, 243 A.2d 533 (1968) (*overruled on other grounds, Marchesi v. Franchino,* 283 Md. 131, 387 A.2d 1129 (1978)) (statements by baseball team owner as to reasons for ticket sellers' discharge were qualifiedly privileged); *Henthorn v. Western Md. R.R.Co.,* 226 Md. 499, 174 A.2d 175 (1961) (railroad employee accused of theft and fired—charge granted qualified privilege); *Beeler v. Jackson,* 64 Md. 589, 2 A. 916 (1886) (statements by employer accusing railroad employee of theft were qualifiedly privileged). An individual also has a qualified privilege to publish anything in his own interest protecting his own reputation against defamation. Prosser, *Torts,* § 115; *see General Motors Corp. v. Piskor, supra,* 277 Md. at 165, 352 A.2d 810.

A person may lose that qualified privilege, however, if the plaintiff can demonstrate that the publication is made for a purpose other than to further the social interest entitled to protection, Restatement (Second) Torts § 603, or can prove malice on the part of the publisher. Regarding the scope of "malice", we made clear in *Marchesi v. Franchino, supra,* 283 Md. at 139, 387 A.2d 1129 that

Knowledge of falsity or reckless disregard for truth is the standard by which the malice required to defeat the conditional privilege defense is to be measured in cases of private defamation [3]

---

3. The "reckless disregard for truth" standard for testing whether malice exists defeating a claim of conditional privilege was not applied to Maryland cases of private defamation until *Marchesi v. Franchino,* 283 Md. 131, 387 A.2d 1129 (1978). That case adopted the standard of malice announced in *New York Times Co. v. Sullivan,* 376

Our cases make clear that resolution of whether the privilege has been abused and whether malice exists is ordinarily a jury question. *General Motors Corp. v. Piskor, supra,* 277 Md. at 165, 352 A.2d 810.

■ Here, a jury may determine that McDermott was not directly a party to an employer-employee relationship with Hughley; but nonetheless, the MNCPPC had retained McDermott under contract as a counsellor and consultant. Furthermore, it could decide that McDermott had a legal duty to publish the defamatory matter, and Hughley's employer was a person to whom its publication is otherwise within the generally accepted standards of decent conduct. In any event, the evidence shows that McDermott told Hughley that their session would not remain confidential and that his findings would be communicated to MNCPPC. Therefore, the written statements of McDermott were qualifiedly shielded from any charge of libel.

■ The actual question here is whether McDermott overstepped the bounds of this conditional privilege and exhibited malice. Because on a motion for summary judgment

---

U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) to defeat the conditional privilege defense in cases of private defamation in order to establish a uniform definition of malice to be applied for all purposes where defamatory conduct is charged. In this manner, hopefully, it will be possible to "avoid the persistent confusion which has been caused by the bi-definitional nature of the phrase 'actual malice.'" 283 Md. at 138–39, 387 A.2d 1129.

In New York Times Co. the Supreme Court first recognized a qualified privilege to protect defamatory statements. In that case, the privilege was applied to protect defamatory statements about the official conduct of a public official, and was deemed to emanate from the First Amendment freedoms of speech and press. *See Miner v. Novotny,* 304 Md. 164, 170, 498 A.2d 269 (1985). Subsequent Supreme Court decisions have reshaped the contours of this privilege, and we have given them ample comment. *See, e.g., Miner v. Novotny, supra,* 304 Md. 164, 498 A.2d 269; *Capital–Gazette Newspapers, Inc. v. Stack,* 293 Md. 528, 537–40, 445 A.2d 1038, *cert. denied,* 459 U.S. 989, 103 S.Ct. 344, 74 L.Ed.2d 384 (1982); *Berkey v. Delia,* 287 Md. 302, 314–22, 413 A.2d 170 (1980); *Jacron Sales Co. v. Sindorf,* 276 Md. 580, 584–94, 350 A.2d 688 (1976); *A.S. Abell Co. v. Barnes,* 258 Md. 56, 58–70, 265 A.2d 207 (1970), *cert. denied,* 403 U.S. 921, 91 S.Ct. 2224, 29 L.Ed.2d 700 (1971).

all inferences are resolved against the movant, we think this issue was properly to be decided by a jury. A jury might conclude that following the initial interview with Hughley, McDermott in fact concluded that Hughley's phobia was real and not merely feigned; that McDermott advised Hughley that he would recommend a transfer; that at the September 29, 1983, meeting at which he restated his belief in the genuineness of Hughley's phobia and at which Hughley denied his consent to hypnosis that McDermott drastically changed his opinion for an improper motive; or that subsequent to that meeting, McDermott forwarded a different diagnosis, characterizing Hughley as a malingerer and a virtual pathological liar. McDermott said his reasons for altering his diagnosis were:

[b]ased on [Hughley's] irascible mood, refusal to cooperate in any way to alleviate this situation at the Mounted Unit other than to be removed, the symptomatology occurring only when given an order, and his stated dislike of the Unit commander.

As such, a jury may have concluded that by going beyond the issues in this incident and assessing Hughley's moral worth and ability to contribute to the MNCPPC in a capacity other than in the Horse Mounted Unit, and by comparing his character to the "pathological character" of "criminal elements," McDermott pushed his privilege beyond permissible limits, and thus evinced a purpose other than furthering the interest entitled to protection. In fact, a jury may have determined that McDermott exhibited malice and thereby forfeited any claim to qualified privilege.

Accordingly, we hold that whether McDermott was entitled to an absolute privilege as a result of Hughley's consent or, assuming a qualified privilege existed, whether that defense was negated by malice, are questions to be resolved by a jury. Thus, the matter should have been submitted for trial.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. PETITIONER TO PAY THE COSTS.