34

75 A.3d 421

Scott SHIRLEY

v.

Eric HECKMAN, et al.

No. 633, Sept. Term, 2012.

Court of Special Appeals of Maryland.

Sept. 6, 2013.

36

Mary Ann Ryan, Laurel, MD, for Appellant.

Shannon M. Marshall (Goodell, DeVries, Leech & Dann, LLP, on the brief), Baltimore, MD, for Appellee.

Panel: BERGER, NAZARIAN and FREDERICK J. SHARER (Retired, Specially Assigned), JJ.

NAZARIAN, J.

Bill Shankly said it most succinctly: "Some people think football is a matter of life and death ... I can assure them that it is much more serious than that." [1] This defamation case comes not from the professional ranks, but from the Rockville Football League (the "League"), which suspended coach (now appellant) Scott Shirley after a parent complained to the League's Board of Directors (the "Board") about his conduct toward an official during a youth football game. Mr.

---

1. The Oxford Dictionary of Quotations 706 (Elizabeth Knowles ed., 5th ed., Oxford University Press 1999) (quoting Sunday Times (England), Oct. 4, 1981). Mr. Shankly, the manager of the Liverpool Football Club in England, spoke of course of the brand of "football" that Americans call soccer. But his sentiment originated here in America and with our brand of football: wittingly or not, Mr. Shankly paraphrased UCLA football coach Henry Russell "Red" Sanders, who declared on the eve of a showdown with USC for a Rose Bowl bid that "[t]his game is not merely a matter of life or death ... [i]t's more important than that." Tommy Hart, *Looking 'Em Over*, Big Spring (Texas) Herald, Dec. 6, 1966.

Shirley appealed his suspension to the Board, as the League's written rules allowed, and lost. He then filed suit in the Circuit Court for Montgomery County, alleging, among other things, that League President Eric Heckman (and thus the League as well) defamed him when Mr. Heckman sent notice of Mr. Shirley's suspension to the Board and a small group of relevant League-affiliated people and when Mr. Heckman recounted the allegations underlying the suspension during the appeal hearing. The circuit court granted summary judgment in favor of Mr. Heckman and the League. After review, the ruling on the field stands.

## I. BACKGROUND

Mr. Shirley began as a coach in the League in 2000 and continued for nearly ten seasons, albeit with some volatility and controversy along the way. During the 2009 season, he coached the Pony League Wolverines to the brink of the League's "Super Bowl." But after the Wolverines' playoff game on November 15, 2009, Maura Fitzgerald, a parent and a member of the Board, lodged a complaint with the Board about an altercation she claimed she witnessed between Mr. Shirley and a volunteer play monitor.[2] Ms. Fitzgerald, who was standing several feet back from the Wolverine sideline, said that she saw and heard Mr. Shirley and a fellow coach verbally abuse the play monitor in close proximity to the children during the third quarter of that game. According to Ms. Fitzgerald, one of the coaches threw a clipboard at the ground and Mr. Shirley used a curse word.[3]

---

**2.** The play monitor assures that each child receives the minimum playing time required by League rules. The rules require that any players who have not played a minimum number of plays by the beginning of the fourth quarter must enter the game immediately and stay in the game until the minimum is fulfilled.

**3.** Ms. Fitzgerald could not remember exactly what word was used, but, at her deposition, she stated that she was "pretty sure it was 'that's bullshit.'"

At its next regular weekly meeting, held on November 18, 2009, the Board addressed Ms. Fitzgerald's complaint. Ms. Fitzgerald attended and described what she saw at the game, and League Commissioner Craig Brodsky, who also witnessed the incident, commented on what he saw and heard as well. Mr. Heckman also recounted a series of prior reports of Mr. Shirley's misbehavior during his League coaching career. Mr. Shirley was not invited or, at that point, informed that the complaint was on the Board's agenda. After hearing the evidence and discussing the matter, the Board voted to suspend Mr. Shirley from coaching indefinitely.[4]

That evening, Mr. Shirley was notified of his suspension via e-mail (the "Notification").[5] The Notification informed Mr. Shirley that after the playoff game, *"[i]t was reported that* [he

---

4. All but one Board member voted for suspension—the other voted to expel Mr. Shirley. During his deposition, Mr. Heckman explained that the Board considered reports of past misbehavior as well as the reports of the November 15 incident in deciding to suspend Mr. Shirley:

[Counsel for Mr. Heckman:] When you read a version of the prior reports that had been received by you or the board captured in Exhibit 3, was—were these episodes, prior reports, and complaints considered by the board during the initial decision to suspend?
[Mr. Heckman:] Yes.
[Counsel for Mr. Heckman:] And so were you giving Mr. Shirley information about what the board had considered to date in electing to suspend him when he read a version of Exhibit 3 at the appeal?
[Mr. Heckman:] Yes.

\*　　\*　　\*

[Counsel for Mr. Heckman:] ... In the past reports and complaints received in Exhibit 3 and captured in Exhibit 3, when you gave Mr. Shirley notice of these prior reports and incidents as information to have been considered by the board, you were not acting as the arbitrator of fact or telling the board that these were facts that you had decided were true, were you?
[Mr. Heckman:] I was reporting what the board—previous board's board members, other people had reported or discussed in board meetings.

5. The Notification was sent as well to the head coach of the Wolverines, James Wilson, League Commissioner Craig Brodsky, and Board Members Ned Ahnell, Ralph Bernardo, Hillary Clagett, Christie Daley, Maura Fitzgerald, Kit Mays, Chuck Miller, Shane Neff, Andy Stefanelli, and Mike Zacks.

was] verbally abusive, used foul language and acted aggressively towards a volunteer play monitor" (emphasis added), and that he was being suspended from "participation in any games or practices in any manner whatsoever." The Notification also advised him of his right under the League's rules to appeal the suspension within seventy-two hours, which he did.

Because the Wolverines were scheduled to play in the League's "Super Bowl" the following weekend, the Board granted Mr. Shirley an expedited appeal hearing on the evening of Friday, November 20 (the "Suspension Hearing"). As League rules provide, the hearing was open; only Board members were invited, but a few parents and coaches attended as well (all attendees were affiliated one way or another with the League). At the Suspension Hearing, Mr. Heckman again described Ms. Fitzgerald's allegations. Mr. Shirley was allotted fifteen minutes to respond. He called two witnesses, Coaches Rick Silver and Brandt Mensch, and read a statement from Coach James Wilson, all of whom testified that Mr. Shirley did not engage in inappropriate conduct during the playoff game. Mr. Heckman then related a series of incidents involving Mr. Shirley that were reported to him by other Board members or spectators between 2002 and 2009, including: a co-coach disassociating himself from a team he coached with Mr. Shirley; an ongoing dispute with a parent involving repeated phone calls by both parties and a call from Mr. Shirley to the parent's employer requesting that the parent be terminated for using company resources for personal business; an on-field verbal fight with a cheerleading coach; a verbal assault on a high school-aged referee during a flag football game; ejection from a pee-wee football game for foul language; repeated missed games and practices; and multiple instances of verbal abuse in the view of children. Mr. Shirley was given five additional minutes to respond and did so. At the conclusion of the hearing, the Board upheld the suspension.

Mr. Shirley then filed suit against Mr. Heckman and the

League (collectively, the appellees).[6] He initially asserted counts of misrepresentation, violation of due process, breach of contract, and defamation against the appellees and the City of Rockville. On April 12, 2011, the circuit court granted summary judgment in favor of the City and dismissed the case against the appellees for insufficient service. Mr. Shirley filed an amended complaint asserting the same four counts, this time only against the appellees. In October 2011, the circuit court dismissed Mr. Shirley's claims for misrepresentation, violation of due process, and breach of contract, leaving only the defamation claim. The defamation claim focused on two publications—Mr. Heckman's statements in the Notification and Mr. Heckman's statements at the Suspension Hearing.[7]

The appellees moved for summary judgment on Mr. Shirley's remaining defamation claim. After a hearing, the circuit court found no genuine disputes of material fact and that the appellees were entitled to judgment as a matter of law *"by virtue of asserting the privilege of common interest or qualified privilege."* (Emphasis added.) The circuit court found that the common interest privilege raised a question of law, that the privilege applied, and that Mr. Shirley failed to demonstrate that Mr. Heckman or the League had abused the privilege. The court relied on *Piscatelli v. Smith,* 424 Md. 294, 35 A.3d 1140 (2012), and specifically its holding that an abuse of privilege required a showing of malice and defining malice as "a person's actual knowledge that his or her statement is false, coupled with his or her intent to deceive another by means of that statement." And in granting the motion, the court concluded that it had "not heard any argument or any evidence anticipated to be presented at trial or that has been discovered to this point to indicate at all that there was any intent to deceive another by means of the statement," and that

6. Mr. Shirley also publicized his situation by sharing information about the lawsuit with the public through a blog and outreach to local news outlets.

7. Mr. Shirley's claims against the League alleged that Mr. Heckman acted as an agent of the League in connection with each statement.

"[t]here is simply nothing that [Mr. Shirley] has argued . . . that in any way indicates that there was actual knowledge that any of these statements were false."

Mr. Shirley filed a motion to alter or amend the judgment that the circuit court denied. This timely appeal followed.

## II. DISCUSSION

Although Mr. Shirley raises two issues in his brief,[8] the appeal as postured really only raises one: whether the circuit court erred in deciding on summary judgment that Mr. Heckman and the League did not abuse the conditional common interest privilege. Mr. Shirley's brief doesn't appear to challenge the appellees' contention (or the circuit court's holding) that the statements at issue are protected by the common interest privilege, and his counsel conceded the point at oral argument. With the privilege in place, we need not, and do not, address whether the statements were defamatory—we assume for present purposes that they were. *Piscatelli*, 424 Md. at 306–07, 35 A.3d 1140. In reviewing the circuit court's finding that the appellees did not abuse the privilege, we review legal conclusions *de novo* and construe all reasonable factual inferences in favor of Mr. Shirley. *Id.* at 305, 35 A.3d 1140.

There are absolute privileges to defamation, but the common interest privilege is not one of them. The common interest privilege is one of the four qualified or conditional privileges to defamation[9] that "is conditioned upon the absence of malice and is forfeited if it is abused." *Piscatelli*, 424

---

8. Mr. Shirley listed one question presented with two subparts:

 1. Whether or not the lower court committed reversible error in awarding summary judgment to the Defendants on the count of defamation[.]

 A. Whether or not the lower court erred in determining whether or not defamation occurred[.]

 B. Whether or not the lower court usurped the function of the jury in determining whether or not any conditional privilege was destroyed[.]

9. The four qualified privileges recognized at common law are:

Md. at 307, 35 A.3d 1140 (citations and quotation marks omitted). As we analyze whether the League or Mr. Heckman abused the privilege, we start with the purpose of the privilege and the scope of the communications it is designed to protect.

 The common interest privilege shields a speaker against liability for defamation arising from statements "publish[ed] to someone who shares a common interest or, relatedly, publish[ed] in defense of oneself or in the interest of others." Dan B. Dobbs, The Law of Torts, § 413, at 1158 (2000). The privilege recognizes the broader public value in "promot[ing] free exchange of relevant information among those engaged in a common enterprise or activity and to permit them to make appropriate internal communications and share consultations without fear of suit." *Gohari v. Darvish,* 363 Md. 42, 58, 767 A.2d 321 (2001) (quoting Dobbs, § 414, at 1160–61). A common interest may be "found among members of identifiable groups in which members share similar goals or values or cooperate in a single endeavor," *id.* (quoting Dobbs, § 414, at 1160–61), and when "the circumstances are such as to lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that facts exist which another sharing such common interest is entitled to know," *id.* at 57, 767 A.2d 321 (quoting *Hanrahan v. Kelly,* 269 Md. 21, 28, 305 A.2d 151 (1973)). There is no rigid definition of "common interest," but the principle that emerges from the cases in which the privilege has applied— *i.e.,* that it covers speakers and recipients within a readily definable business or organizational relationship [10]—easily en-

---

(1) The public interest privilege, to publish materials to public officials on matters within their public responsibility; (2) the privilege to publish to someone who shares a common interest, or, relatedly, to publish in defense of oneself or in the interest of others; (3) the fair comment privilege; and (4) the privilege to make a fair and accurate report of public proceedings.
*Gohari v. Darvish,* 363 Md. 42, 57, 767 A.2d 321 (2001). None of the others is implicated here.

10. *See, e.g., Gohari,* 363 Md. at 58, 767 A.2d 321 (statements by former employer about a former employee who listed employer as a reference);

compasses the common interest that Messrs. Shirley and Heckman, the members of the Board, and League participants share in the League and its orderly (written) and hearing processes, even if Mr. Shirley had not conceded the point.

Once the privilege is found or conceded to apply, the burden shifts to Mr. Shirley to prove that the appellees breached the condition to (or, interchangeably, abused) the conditional privilege. *See Piscatelli*, 424 Md. at 307, 35 A.3d 1140. Mr. Shirley can meet this burden by "demonstrating that 'the publication is made for a purpose other than to further the social interest entitled to protection ... or [by proving] malice on the part of the publisher.'" *Gohari*, 363 Md. at 64, 767 A.2d 321 (quoting *McDermott v. Hughley*, 317 Md. 12, 29, 561 A.2d 1038 (1989)). Abuse of a conditional privilege is usually a question for the fact-finder, *id.*, but a court can decide the question as a matter of law if the plaintiff fails to allege or prove facts that would support a finding of abuse. *See Piscatelli*, 424 Md. at 308, 35 A.3d 1140.

Mr. Shirley argues that the appellees defamed him through two sets of statements, both published by Mr. Heckman, that described allegations of (mis)behavior by Mr. Shirley, and that he proffered evidence from which a jury could find that the appellees abused the privilege. In the first publication, the Notification, Mr. Heckman explained the basis for the League's decision to suspend Mr. Shirley in an email he sent to Mr. Shirley, the Board, the League Commissioner, and Mr. Wilson. The second publication occurred during the Suspension Hearing, when Mr. Heckman "made a verbal presentation to those assembled, listing a litany of 'bad acts' by [Mr.] Shirley as justification for the suspension." The appellees

---

*McDermott v. Hughley*, 317 Md. 12, 28–29, 561 A.2d 1038 (1989) (listing examples of employer/employee cases and noting that "[a]n individual also has a qualified privilege to publish anything in his own interest protecting his own reputation against defamation"); *Hanrahan*, 269 Md. at 28, 305 A.2d 151 (statements among parties to a real estate transaction); *Davidson v. Seneca Crossing Section II Homeowner's Ass'n, Inc.*, 187 Md.App. 601, 646, 979 A.2d 260 (2009) (statements among members of a homeowner's association).

respond that the Board members and coaches who received the Notification, and the Board members, coaches, and parents in attendance at the Suspension Hearing (all of whom were affiliated with the League) fell within an "identifiable group" bound together by a common interest, *i.e.*, the orderly and just operation of the League according to its written rules. The circuit court found that Mr. Shirley failed as a matter of law to proffer facts sufficient to support a finding of abuse in either of the recognized forms. We agree.

**A. Mr. Shirley Failed To Produce Evidence That Could Support A Finding That Mr. Heckman Acted With Malice.**

We take the second prong first. Malice, as defined by the Court of Appeals, requires proof of "a person's actual knowledge that his [or her] statement is false, coupled with his [or her] intent to deceive another by means of that statement." *Piscatelli*, 424 Md. at 307–08, 35 A.3d 1140 (brackets in original) (quoting *Ellerin v. Fairfax Sav. F.S.B.*, 337 Md. 216, 240, 652 A.2d 1117 (1995)). Mr. Shirley asks us to look instead to whether the record contained evidence that Mr. Heckman made the statements with knowledge of falsity or reckless disregard for their truth. Although the analytical trail is a little winding and not well-marked, we hold that the circuit court followed the right path.

No case says so in so many words, but a careful reading of three opinions from the Court of Appeals reveals a collective holding that the *Ellerin* definition of malice determines whether a speaker has abused *any* of the conditional privileges to defamation. The first milestone is *Marchesi v. Franchino*, 283 Md. 131, 387 A.2d 1129 (1978), a common interest privilege case, in which the Court of Appeals held that the same standard of malice defines eligibility for punitive damages *and* whether conditional privileges have been abused in defamation cases. *Id.* at 138–39, 387 A.2d 1129. *Marchesi* applied the then-governing definition of malice, which required a plaintiff to prove that the speaker acted with "knowledge of falsity or reckless disregard for truth." *Id.* at 139, 387 A.2d 1129. But

that definition of malice was superseded ten years later, in *Le Marc's Management Corp. v. Valentin*, 349 Md. 645, 651–54, 709 A.2d 1222 (1998), when the Court adopted the *Ellerin* definition of malice as the standard for punitive damages for defamation. The final step is *Piscatelli*, which cited and followed the *Ellerin* malice definition in analyzing abuse of the fair reporting and fair comment privileges. *Piscatelli*, 424 Md. at 307–08, 35 A.3d 1140. So although we recognize that the privileges analyzed in *Piscatelli* are imbued with free press implications that the common interest privilege is not, *see id.* at 309–17 & nn. 3–5, 35 A.3d 1140 the combination of these precedents directs us to apply the *Ellerin* malice standard here to determine whether the appellees abused the common interest privilege.

The statements at issue here fall well short of demonstrating even a potential for malice under the *Ellerin* standard. In both instances, Mr. Heckman simply reported allegations that others lodged with the Board and the evidence on which the Board relied in deciding to suspend Mr. Shirley and to uphold the suspension. In the Notification, Mr. Heckman told Mr. Shirley (and the indisputably League-affiliated recipients) that *"[i]t was reported* that you were verbally abusive, used foul language and acted aggressively towards a volunteer play monitor," and that the behavior was confirmed by Mr. Brodsky—he made no accusations of his own, or on behalf of the Board, and offered no views on the truth of the allegations. Mr. Shirley does not (and cannot) dispute that Ms. Fitzgerald submitted her complaint to the Board, nor does he contend that Mr. Heckman misstated, embellished, or otherwise misreported her account. In his capacity as Board President, Mr. Heckman published the Notification to a limited and relevant group of people sharing a common interest in the League and its processes, for the purpose of providing notice of the suspension to Mr. Shirley in the manner the League's rules required. The minutes of the Board's initial meeting and the depositions of Ms. Fitzgerald and Mr. Heckman confirmed the fact and substance of Ms. Fitzgerald's complaint and that her

allegations were *reported* to the Board as the Notification described, and Mr. Shirley offers no evidence to the contrary.

Mr. Shirley contends that "the court disregarded evidence that [Mr.] Brodsky asserted that he did not confirm the behavior described in the email." But Mr. Brodsky sent his e-mail *after* Mr. Heckman sent the Notification, so it could not have affected anyone's views of the merits. Moreover, his argument misses the point: the Notification served a specific purpose under the rules of the League, *i.e.*, to notify Mr. Shirley of the suspension and its bases and to advise him of his right to appeal. Mr. Shirley proffered no evidence that Mr. Heckman (mis)used the League's notice rules to publish statements he knew to be false with the intent to deceive others—the record reveals only that the Notification disclosed the League's initial decision to suspend Mr. Shirley and the allegations on which that decision was based.

■ Mr. Shirley's allegations of malice arising from the Suspension Hearing suffer the same fate, for two reasons. Mr. Shirley produced no evidence from which a jury could find that Mr. Heckman *knew* that the reports of Mr. Shirley's behavior were false or that his statements during the course of the Hearing were intended to deceive. At most, the record reveals competing evidence and differing points of view about Mr. Shirley's behavior. Mr. Shirley produced two e-mails Mr. Heckman received in May 2007, in response to a League decision to censure Mr. Shirley, that disputed two then-Board members' first-hand reports of Mr. Shirley's behavior at a May 2007 flag football game.[11] Mr. Shirley also called two witnesses at the Suspension Hearing who presented first-hand accounts of the playoff game incident that disputed Ms. Fitzgerald's account. But these conflicting reports simply demonstrate disputes of fact about what happened, and the purpose

---

11. There is no evidence in the record supporting a finding that Mr. Heckman had heard any evidence disputing the eight other incidents relied upon by the Board in suspending Mr. Shirley prior to reciting those incidents at the hearing. Without such evidence, Mr. Shirley cannot establish that Mr. Heckman had any knowledge of falsity of those reports.

of the hearing—just like the purpose of the hearing in the circuit court and the oral argument before us on appeal—was to air out those factual disputes and arguments so that the Board could make a decision. The record reveals that the Board undertook considerable due diligence in gathering information for the hearing,[12] and reveals no evidence that Mr. Heckman or anyone else published accusations during the hearing that they knew to be false.

### B. Mr. Shirley Failed To Produce Evidence From Which A Reasonable Jury Could Find That Mr. Heckman's Statements Were Made For A Purpose Outside The Common Interest.

Mr. Shirley also could have proven abuse of the common interest privilege by establishing that Mr. Heckman's publications were "made for a purpose other than to further the social interest entitled to protection." *Gohari*, 363 Md. at 64, 767 A.2d 321. But we find independently dispositive the fact that Mr. Heckman was acting in his capacity as League president when he sent the Notification and when he presided over the Hearing, which had been convened pursuant to the League's rules to consider Mr. Shirley's suspension, and that all allegedly defamatory statements published in the Notification and during the Suspension Hearing were published in that role. Put another way, Mr. Heckman was entitled to summary judgment because he published the offending statements while he was acting quintessentially *within* the common interest.

Again, the purpose of the common interest privilege is to promote and protect the free exchange of information, and to allow those sharing the common interest to speak freely and defend themselves. The privilege contemplates that discourse within the common interest could, and perhaps should, be

---

12. During his deposition, Mr. Heckman was questioned at length by counsel for Mr. Shirley regarding a list of prior incidents that Mr. Heckman referenced during the Suspension Hearing. For each prior incident, Mr. Heckman explained the specific first-hand account he received.

more frank, blunt or hurtful than the law would tolerate outside of that sphere. The League's rules define the space for that discourse, and specifically created the requirement that the League, through Mr. Heckman, send the Notification and convene the Suspension Hearing. These mechanisms provided Mr. Shirley with notice of the League's action and an opportunity to appeal, and they *required* Mr. Heckman to make both publications: the rules state specifically that "[a]ll coaches shall be entitled to notice, public hearing, and other due process protection with respect to any disciplinary action by the [League's] Board of Directors," and, at the public hearing, that "the [League's] Board of Directors ... shall disclose to the coach ... the nature of the complaints forming the basis for the action." Obviously, Mr. Shirley did not consent to be defamed simply by invoking his right to appeal the League's decision and participating in the Suspension Hearing. But the subject matter of the proceeding he requested necessarily required that Mr. Heckman have appropriate latitude in speaking about Mr. Shirley's alleged behaviors, current and past, to the extent that they bore on the discipline question before the Board. *See Gohari*, 363 Md. at 60, 767 A.2d 321 ("The fact that the recipient has made the request is an indication that he, at least, regards the matter in respect to which information is desired as sufficiently important to justify the publication of any defamatory matter that may be involved in response to the request." (quoting Restatement (Second) of Torts § 595, at 273–74 (1977))); *Happy 40, Inc. v. Miller*, 63 Md.App. 24, 35–36, 491 A.2d 1210 (1985).

We hold that so long as they are not speaking or acting with malice, the League and individuals within its sphere of common interest are immune as a matter of law from liability for defamation arising from statements published in connection with the League's disciplinary process, *see Gohari*, 363 Md. at 63–64, 767 A.2d 321, and that the circuit court correctly granted summary judgment to the appellees. A candid and transparent process for communicating and deciding disciplinary matters promotes the League's broader purposes, and a meaningful threat of potential liability for defamation could

discourage players, parents or Board members from raising, pursuing and trying to solve disputes or behavior problems within the League. This interest in free expression flows both ways: just as the League had an interest in ensuring that Mr. Heckman could speak freely while he presided over the Hearing, it had an equally important interest in ensuring that Mr. Shirley could speak freely in his own defense. So like Mr. Heckman, Mr. Shirley would also be protected from liability (subject, of course, to the same malice limitation) for statements he might make at the Suspension Hearing about the conduct, good faith or *bona fides* of witnesses, Board members or others falling within the zone of common interest. This does not mean, of course, that anyone affiliated with the League can freely defame anyone else on matters relating to the League—the League's rules define the fora for, subjects of and people entitled to participate in the protected expression,[13] and the protection does not apply outside of those bounds, nor to statements that fail the malice test.

\* \* \*

Because Mr. Shirley failed to proffer evidence that could support a finding that the appellees abused the common interest privilege, either by establishing malice or that Mr. Heckman's statements strayed outside the common interest, the circuit court correctly granted summary judgment in their favor.

**JUDGMENT OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

---

**13.** There is no dispute that the Notification and notice of the Suspension Hearing were published in a manner consistent with the League's rules. Mr. Heckman e-mailed the Notification only to the Wolverines' coach, the League Commissioner, and to the Board. And under the League's rules, any member of the public was entitled to attend the Suspension Hearing. Moreover, the audience was comprised entirely of individuals affiliated with the League—all parents who attended either were Board members (and thus invited) or attended on their own, not at the appellees' invitation, a fact that both Mr. Heckman and Mr. Shirley acknowledged in their depositions.