**Lonnie SMITH, Appellant,**

v.

**Jeannette HOLLEY, Appellee.**

**No. 04–90–00528–CV.**

Court of Appeals of Texas,
San Antonio.

Feb. 28, 1992.

Rehearing Denied April 14, 1992.

Rick G. Strange, Terry Rhoads, Cotton, Bledsoe, Tighe & Dawson, Midland, and Thomas H. Crofts, Jr., Crofts, Callaway & Jefferson, San Antonio, for appellant.

Thad Harkins, Hubert W. Green, and Melissa G. Guthrie, Green, McReynolds & Reed, San Antonio, for appellee.

Before PEEPLES, CARR and GARCIA, JJ.

## OPINION

PEEPLES, Justice.

Lonnie Smith appeals a judgment based on a jury finding that he defamed Jeannette Holley by allowing a prospective employer to review documents concerning her and by discussing her job performance. The jury awarded Holley $500,000 in actual damages, and a like amount in punitive damages based on a finding that Smith acted with malice. The trial court disregarded the malice finding and rendered judgment on the verdict for the actual damages. Smith appeals on seventeen points of error. In one cross-point, Holley appeals the denial of punitive damages. We reverse and render judgment that Holley take nothing from Smith.

In 1984 the Big Spring Police Department hired Holley as a probationary employee. After completing the police academy program, she began field training in the

company of experienced officers. The first officer gave her favorable evaluations, but after that it was all downhill. Holley was assigned to ride with a second field training officer, who made her feel stupid for asking questions, gave no timely feedback, and asked that they not ride together again. She was assigned to a third training officer, but within a few days, on November 22, 1984, she was told that she would be terminated. Smith made this decision. Holley challenged the contents of the untimely evaluations made by the second training officer and appealed her dismissal, but she was unsuccessful and was terminated.

In December 1984, Holley and the city manager agreed that: (1) the police department would reinstate Holley, and she would tender her resignation effective retroactively to November 21, citing personal reasons; and (2) the City would purge from its personnel records all references to the involuntary termination, and would mark each page of her personnel file with a notice limiting the information available to anyone asking about Holley's employment record.[1]

In the spring of 1985, Holley applied for a job with the United States Marshals Service ("USMS") and executed a form authorizing persons contacted to give out information about job applicants. The relevant text of that authorization reads:

### AUTHORIZATION FOR RELEASE OF INFORMATION

I hereby authorize any Investigator or duly accredited representative of the United States Civil Service Commission bearing this release ... to obtain any information from schools, residential management agents, employers, criminal justice agencies, or individuals, relating to my activities. This information may include, but is not limited to, academic, residential, achievement, performance, attendance, personal history, disciplinary, arrest, and conviction records. I hereby direct you to release such information upon request of the bearer. I understand that the information released is for official use by the Commission and may be disclosed to such third parties as necessary in the fulfillment of official responsibilities.

I hereby release any individual, including record custodians, from any and all liability for damages of whatever kind or nature which may at any time result to me on account of compliance, or any attempts to comply, with this authorization.

A USMS investigator contacted the Big Spring Police Department in the summer of the following year as part of the routine civil service background check. At that time, Smith was Big Spring's acting Chief of Police, with access to personnel files located in another building. After receiving a copy of Holley's authorization form, Smith told the USMS investigator about his dealings with Holley, and he had another officer talk to the investigator as well. Smith also shared documents with the investigator.

Several months later, USMS notified Holley that it would not hire her. Its rejection letter, based on information from Smith,

---

1. The notice was to read as follows:

NOTICE
TO BE PLACED IN THE TOP OF EACH CITY OF BIG SPRING FILE RELATING TO JEANNETTE (JANET) HOLLEY
Anyone inquiring about the employment history of Jeannette (Janet) Holley with the City of Big Spring shall only be informed as follows:
1. Mrs. Holley began working for the Big Spring Police Department on June 1, 1984 as a police officer trainee.
2. Mrs. Holley resigned for personal reasons on November 21, 1984.

3. City policy prohibits any additional information about prior employees from being released.
ABSOLUTELY NOTHING BUT THE ABOVE INFORMATION WILL BE RELEASED TO *ANYONE* BY *ANYBODY.*
The agreement also included this provision:
In the event of any inquiry from any prospective employer ... only [these] three points ... will be read or given out. This information will be the *only* information given out regarding her termination as a police officer, either officially or unofficially by anyone connected with the City of Big Spring. (Emphasis in original.)

said that she failed probation at Big Spring, was reinstated, and then resigned. The USMS investigation, said the letter, revealed that her failure of probation "was based on (1) pulling a weapon in a public place; (2) inconsistent facts or reports; and (3) failure to follow chain of command." The letter characterized these actions as "irresponsible behavior" and informed Holley that she would not be recommended for employment.

Holley sued Smith, the City of Big Spring, and three former officials (the former city manager, city attorney, and police chief). She alleged causes of action for defamation per se and breach of contract. Smith was found liable for defamation; the claims against all other defendants were resolved in their favor and are not involved in this appeal. Holley's defamation count concerns the three statements mentioned in the USMS letter. Her live pleading alleged, "Publication of those grounds to the U.S. Marshals Service for plaintiff's termination as a police officer in the City of Big Spring, Texas, constitutes defamation against your plaintiff."

■ Ordinarily a *qualified* privilege protects communications made in good faith on subject matter in which the author has a common interest with the other person, or with reference to which he has a duty to communicate to the other person. *See Houston v. Grocers Supply Co.,* 625 S.W.2d 798, 800 (Tex.App.—Houston [14th Dist.] 1981, no writ); *Moore & Assoc. v. Metropolitan Life Ins. Co.,* 604 S.W.2d 487, 490 (Tex.Civ.App.—Dallas 1980, no writ); PROSSER & KEETON ON TORTS § 115, at 828–30 (5th ed. 1984). This qualified privilege protects a former employer's statements about a former employee to a prospective employer. *See Butler v. Central Bank & Trust Co.,* 458 S.W.2d 510, 514–15 (Tex.Civ.App.—Dallas 1970, writ dism'd); *Duncantell v. Universal Life Ins. Co.,* 446 S.W.2d 934, 937 (Tex.Civ.App.—Houston [14th Dist.] 1969, writ ref'd n.r.e.); 2 F. HARPER, F. JAMES, & O. GRAY, THE LAW OF

TORTS § 5.26, at 228 (2d ed. 1986). We need not reach Smith's points dealing with qualified privilege because the "Authority for Release of Information" that Holley signed and gave to the USMS makes this a case of *absolute* privilege instead of qualified privilege.

In point one Smith argues that the authorization immunizes him from liability for any defamatory statements he made in response to it. Holley replies that (1) it would violate public policy to enforce a release of an intentional tort, such as defamation; (2) the authorization did not encompass the information given by Smith because her agreement with the city manager sheltered it; and (3) Smith was not released because the instrument did not specifically name him. We agree with Smith and hold that the authorization was a valid release or consent to defamation that bars Holley's defamation suit.

I.

Holley is incorrect in suggesting that one cannot consent to a defamation, and that an instrument that consents to intentional torts is per se against public policy. On the contrary, the efficacy of such consent is recognized and approved by the Restatement of Torts, learned treatises, Texas case law, and the law of other states. The scope and extent of a consent instrument will vary with each case, and we discuss the extent of Holley's consent in section two. But it is clear that one can consent to a defamation, and that consent creates an absolute bar to a defamation suit.

■ When a plaintiff has consented to a publication,[2] the defendant is absolutely privileged to make it, even if it proves to be defamatory. "[T]he consent of another [the person defamed] to the publication of defamatory matter concerning him is a complete defense to his action for defamation." RESTATEMENT (2D) OF TORTS § 583 (1977). "The general social policy of denying recovery for conduct to which the plaintiff has given his consent finds expres-

---

2. "Publication of defamatory matter is its communication intentionally or by a negligent act to one other than the person defamed." RESTATE-

MENT (2D) OF TORTS § 577(1) (1977). *See Kelley v. Rinkle,* 532 S.W.2d 947, 948 (Tex.1976).

sion in an absolute immunity in cases where consent is given to defamation." PROSSER & KEETON ON TORTS § 114, at 823 (5th ed. 1984).

Texas follows this general rule, and the courts have applied it when a defendant has given defamatory information in response to a plaintiff's general authorization or request for comments. "[I]f the publication of which the plaintiff complains was consented to, authorized, invited or procured by the plaintiff, he cannot recover for injuries sustained by reason of the publication." *Lyle v. Waddle*, 144 Tex. 90, 188 S.W.2d 770, 772 (1945) (plaintiff asked for or consented to defendant physician's writing of letter concerning her treatment). The *Lyle* court based this ruling on its earlier statement of the same principle. *See Renfro Drug Co. v. Lawson*, 138 Tex. 434, 160 S.W.2d 246, 251 (1942).

Later cases have continued to hold that consent bars an action for defamation. In *Duncantell v. Universal Life Ins. Co.*, 446 S.W.2d 934 (Tex.Civ.App.—Houston [14th Dist.] 1969, writ ref'd n.r.e.), plaintiff, while applying for a job, dialed the telephone number of a former employer and handed the phone to the prospective employer. The court held that the former employer's unflattering and defamatory remarks were not actionable. *Id.* at 936. In *Mayfield v. Gleichert*, 437 S.W.2d 638 (Tex. Civ.App.—Dallas 1969, no writ), the plaintiff doctor sued a hospital for defamatory remarks contained in a report that she had asked for. The court held that the statements would not support a defamation action. *Id.* at 641-42. In *Wilks v. DeBolt*, 211 S.W.2d 589 (Tex.Civ.App.—Texarkana 1948, no writ), a fire had damaged the plaintiff's house. A friend investigated the fire for the plaintiff to help her prepare an insurance claim. The defendant fire marshall told the friend that the plaintiff had caused the fire, a statement that suggested arson. The court held that the plaintiff had consented to the defamatory state-

ment. *Id.* at 590-91. In *Duncantell, Mayfield*, and *Wilks*, the courts held also that the statements were qualifiedly privileged and that the speakers acted without malice.

The consent privilege applies when the plaintiff has given references for a prospective employer to contact, and the former employer makes defamatory statements about her. "[T]he employee who has been discharged, but who consents to inquiries to previous employers for references in connection with an application for a new job, must be considered willing that presumably unfavorable views be published to the potential new employer." 2 F. HARPER, F. JAMES, & O. GRAY, THE LAW OF TORTS § 5.17, at 138-39 (2d ed. 1986). This principle has been applied in Texas. *See Duncantell*, 446 S.W.2d at 936. And in other jurisdictions a former employer has absolute immunity when he utters the alleged defamation in response to an inquiry from a prospective employer with the plaintiff's consent. *See Litman v. Massachusetts Mut. Life Ins. Co.*, 739 F.2d 1549, 1560 (11th Cir.1984), *cert. denied*, 484 U.S. 1006, 108 S.Ct. 700, 98 L.Ed.2d 652 (1988) (applying Florida law); *Gengler v. Phelps*, 92 N.M. 465, 589 P.2d 1056, 1057-58 (Ct. App.1978). *See also Patane v. Broadmoor Hotel, Inc.*, 708 P.2d 473, 476 (Colo.Ct.App. 1985) (former employer absolutely privileged in discussing plaintiff's work history with employment counselor hired by plaintiff, even if defamatory statements made).

There is some uncertainty whether in Texas consent creates an absolute privilege or simply is a circumstance that makes a defamation not actionable. According to the restatement and the treatises, consent creates an absolute privilege. *See* RESTATEMENT (2D) OF TORTS § 583; PROSSER & KEETON ON TORTS § 114; 2 F. HARPER, F. JAMES, & O. GRAY, THE LAW OF TORTS § 5.17. Elsewhere Prosser suggests that assumption of risk may be the proper analysis and that for intentional torts generally absence of consent is part of plaintiff's case in chief.[3]

---

**3.** "Where the plaintiff is uncertain as to just what will be said, but consents to publication which he has reason to believe may be defamatory, the defense would seem properly to be

one of assumption of risk." PROSSER & KEETON ON TORTS § 114, at 823 n. 95. While Prosser classifies consent generally as a defense to intentional torts, he criticizes that classification and sug-

Using different terminology, the Texas cases say that a publication made in response to consent is not actionable. *See Lyle v. Waddle*, 144 Tex. 90, 188 S.W.2d 770, 772 (1945) (plaintiff "cannot recover" for defamatory publication to which he consented); *Duncantell v. Universal Life Ins. Co.*, 446 S.W.2d at 937 ("One may not recover the damage caused by a publication invited by him"); *Mayfield v. Gleichert*, 437 S.W.2d at 642 (libelous statements made in response to plaintiff's request "will not support an action"); *Wilks v. DeBolt*, 211 S.W.2d at 590 (defamatory responses to plaintiff's investigator are "privileged" and "would not be actionable"). A recent case involving business disparagement cites with apparent approval § 583 of the restatement (which classifies consent as an absolute privilege) but then suggests in dictum that absolute privileges exist only in matters involving the branches of government. *See Hurlbut v. Gulf Atlantic Life Ins. Co.*, 749 S.W.2d 762, 768 (Tex. 1987). In this case there are no issues of burden of proof and production, and the result is the same regardless of the terminology used. Smith's motion for judgment n.o.v. asserted that the authorization bars the defamation suit. Point of error one brings that contention forward on appeal.

Holley cites *Smith v. Golden Triangle Raceway*, 708 S.W.2d 574 (Tex.App.—Beaumont 1986, no writ), which held that a form release signed by a spectator who wanted access to the pit area at a race track could not waive the right to sue for damages caused by gross negligence. The court cited RESTATEMENT (2D) OF CONTRACTS § 195 (1979), which says, "A term exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy." Gross negligence was the only issue before the court in *Golden Triangle*, and the principle stated there does not apply to defamation.

Concerning intentional conduct, the rule stated in *Golden Triangle* is too broad; it is universally held that in the right circumstances one can consent to certain actions that otherwise would be intentional torts. This is true of defamation, surgical procedures, trespass to land, sporting events that involve physical contact, and a host of other acts that would be tortious in the absence of consent. *See generally* PROSSER & KEETON ON TORTS § 18 (consent as defense to intentional torts). Moreover, even when an act is a *criminal offense*, consent can bar a tort suit, though not a criminal prosecution. With certain exceptions not involved here,[4] "consent is effective to bar recovery in a tort action although the conduct consented to is a crime." RESTATEMENT (2D) OF TORTS § 892C (1979).

■ Consent creates an *absolute* privilege, which is unaffected by a finding that the speaker acted with malice.

The privilege conferred by the consent of the person about whom the defamatory matter is published is absolute. The protection given by it is complete, and it is not affected by [1] the ill will or personal hostility of the publisher or [2] by any improper purpose for which he may make the publication, unless the consent is to its publication for a particular purpose, in which case the publication for any other purpose is not within the scope of the consent.

gests that absence of consent is part of the plaintiff's case in chief:

[Consent] is not, strictly speaking, a privilege, or even a defense, but goes to negative the existence of any tort in the first instance. It is a fundamental principle of the common law that *volenti non fit injuria*—to one who is willing, no wrong is done. The attitude of the courts has not, in general, been one of paternalism. Where no public interest is contravened, they have left the individual to work out his own destiny, and are not concerned with protecting him from his own folly in permitting others to do him harm. As to intentional invasions of the plaintiff's interests, his consent negatives the wrongful element of the defendant's act, and prevents the existence of a tort.
*Id.* § 18, at 112.

4. Section 892C(2) of the restatement lists this exception: "If conduct is made criminal in order to protect a certain class of persons irrespective of their consent, the consent of members of that class to the conduct is not effective to bar a tort action."

*Id.* § 583, comment *f.* "When the privilege is absolute, the actor's motivation is irrelevant." *Hurlbut v. Gulf Atlantic Life Ins. Co.,* 749 S.W.2d 762, 768 (Tex.1987). Privileges "elevate the good to be accomplished by the free and open exchange of information over the harm which may result from a falsehood." *Id.* When an absolute privilege or immunity applies, "the court will not permit an inquiry into motive or purpose, since this could result in subjecting the honest person to harassing litigation and claims." PROSSER & KEETON ON TORTS § 16, at 109.

■ For the reasons stated, we hold that one can consent to a defamation, and that consent is an absolute bar to a defamation action.

## II.

We consider now the scope and extent of the consent signed by Holley. Consent does not necessarily give a former employer license to tell the world everything he knows about the plaintiff for an unlimited time, unless that is a reasonable interpretation of the consent. The extent of the consent does not exceed what is reasonable in light of the language or circumstances that created it:

> The extent of the privilege is determined by the terms of the consent. These again are to be determined by the language or acts by which it is manifested in the light of the surrounding circumstances. If the person to whom the consent is given reasonably interprets the language used or the acts done as a consent to the publication of the defamatory matter to any person, at any time, in any manner and for any purpose, the publication however made is privileged. On the other hand, a consent may be limited to a publication to a particular person or at a particular time or for a particular purpose.

RESTATEMENT (2D) OF TORTS § 583, comment *d.* "As in other cases of consent, the privilege is limited by the scope of the assent apparently given, and consent to one form of publication does not confer a license to publish to other persons, or in a different manner." PROSSER & KEETON ON TORTS § 114, at 823. "The scope of the immunity is determined by the terms of the consent. A consent to publish a statement to a particular person is not a license to publish it to the world." 2 F. HARPER, F. JAMES, & O. GRAY, THE LAW OF TORTS § 5.17, at 136.

■ Here Smith did not exceed the authorization. He responded promptly, he spoke only of Holley's job performance and her capabilities, and he gave the information to the investigator and no one else.

■ The authorization is worded broadly enough to reach all kinds of defamatory remarks, even those uttered by employees of the City of Big Spring. It does not authorize disclosures of true information only, or favorable information. It does not reserve the right to sue providers of information that Holley disagrees with. On the contrary, it is broad and all-encompassing in three different ways: it authorizes contact with a large and diverse group of people, it contemplates wide and probing inquiry into every aspect of Holley's background, and it then releases every kind of lawsuit imaginable.

The instrument first authorizes the marshals service to contact almost anyone and "to obtain any information from schools, residential management agents, employers, criminal justice agencies, or individuals, relating to my activities." Second, it authorizes the persons contacted to give a great variety of information, which "may include, but is not limited to, academic, residential, achievement, performance, attendance, personal history, disciplinary, arrest, and conviction records." It does not stop at *authorizing* the disclosure of information; it *directs* those who possess information about Holley to disclose it to the investigator, who is acting for the United States Civil Service Commission. Finally, it releases Holley's right to sue, using language as broad and inclusive as we can imagine. It says, "I hereby release *any individual,* including record custodians, from *any and all liability* for *damages of whatever kind or nature* which may *at any time* result to me on account of com-

pliance, or any attempts to comply, with this authorization." (Emphasis added.)

The authorization simply does not permit the interpretation that the signer reserved the right to sue persons who honor it and give information fairly related to the matters covered. Nothing suggests that Holley authorized only the release of favorable replies. That construction would, of course, make authorizations to respond to background checks completely worthless. The release says, in effect, you may find out what other people say about me, and I will not litigate if the responses are unfavorable. Fairly viewed, it does not exclude from its reach defamatory remarks about Holley's job performance uttered to the investigator.

■ Consent does not immunize defamations that the plaintiff had no reason to anticipate. The restatement makes this clear:

It is not necessary that the [plaintiff] know that the matter to the publication of which he consents is defamatory in character. It is enough that he knows the exact language of the publication or that he has reason to know that it may be defamatory.... In such a case, by consent to its publication, he takes the risk that it may be defamatory.

RESTATEMENT (2D) OF TORTS § 583, comment d. See Duncantell v. Universal Life Ins. Co., 446 S.W.2d 934, 937 (Tex.Civ.App.—Houston [14th Dist.] 1969, writ ref'd n.r.e.) ("plaintiff invited the publication ... when he should have known that [it] would adversely affect his opportunity for employment"); McDermott v. Hughley, 317 Md. 12, 561 A.2d 1038, 1045–46 (1989) (absolute privilege applies if plaintiff had reason to anticipate the defamation).

■ But this limitation on the privilege does not avail Holley because it is undisputed that she knew that Smith and others at the Big Spring Police Department held unfavorable opinions about her performance there. This distinguishes Holley's case from Frank B. Hall & Co. v. Buck, 678 S.W.2d 612 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.), cert. denied,

472 U.S. 1009, 105 S.Ct. 2704, 86 L.Ed.2d 720 (1985). In Buck there was no evidence that the former employee knew that the former employer might defame him. In addition, there is no indication that the former employee had signed a broad consent form, as Holley had done. Similarly, in Ramos v. Henry C. Beck Co., 711 S.W.2d 331, 336 (Tex.App.—Dallas 1986, no writ), the court held that consent did not bar the defamation action because the plaintiff did not know that the former employer's employee would defame him. Both Ramos and Buck reaffirmed the rule of Lyle v. Waddle, 144 Tex. 90, 188 S.W.2d 770, 772 (1945), that one may not recover for a publication to which he consented, or which he authorized, procured, or invited. Ramos, 711 S.W.2d at 336; Buck, 678 S.W.2d at 617.

■ The reach of the authorization is not affected by the city's agreement to keep secret the real reasons for Holley's departure from the police force. Smith was not a party to the city manager's agreement with Holley; and in any event, the jury found that no damages resulted from the city's breach of it, a finding that Holley does not appeal. The jury did find that Holley did not waive her right to insist on compliance with the agreement, but that finding has nothing to do with Smith because the agreement did not bind him in the first place. We note also that Holley did not merely authorize prior employers to let the USMS review documents in her file at the police department and other places; she authorized personal contact with individuals, and she authorized the release of information. Perhaps Holley thought the authorization did not consent to disclosure of unfavorable information about her employment at Big Spring. But unambiguous written instruments are interpreted according to their wording, not the unwritten subjective intentions of the parties. See Westwind Exploration, Inc. v. Home Sav. Ass'n, 696 S.W.2d 378, 382 (Tex.1985); City of Pinehurst v. Spooner Addition Water Co., 432 S.W.2d 515, 518–19 (Tex. 1968). Those who respond to an authorization are entitled to interpret it objectively

on its own terms, without trying to divine the signer's subjective understanding of it.

We hold that the authorization granted Smith the right to make the three statements he made to the USMS investigator.

### III.

It is of no significance that the release did not expressly name Smith. The restatement does not support such a rigid rule; it focuses on the circumstances or the language of the consent instrument. *See* RESTATEMENT (2D) OF TORTS § 583, comment *d.* To require specific names would render consent forms useless by chilling the willingness of former employers to respond candidly. That would often limit civil service and other investigations to information provided by persons screened by the job applicant.

Holley cites cases involving releases for tortious conduct in the past. It is true that in such cases a person is released from liability only if named or identified in the release document. *See Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 419–20 (Tex. 1984); *McMillen v. Klingensmith*, 467 S.W.2d 193, 196 (Tex.1971). But the court in *Duncan* was referring only to releases from liability for a completed tortious event in the past. "A tortfeasor can claim the protection of a release only if the release refers to him by name or with such descriptive particularity that his identity *or his connection with the tortious event is not in doubt.*" 665 S.W.2d at 420 (emphasis added). In all the cases applying this rule, the release pertained to a completed tort.

 The instrument before us requires a different rule because it is not a *release for past conduct* but a *consent to future conduct.* There is no way that a general release concerning future conduct could name unknown persons that a prospective employer might interview. If the parties want to draft such a limited release, they are of course free to do so. But to extend the *Klingensmith–Duncan* rule to a general consent to future conduct would make such consent agreements ineffective and would severely hinder the candid exchange of information that is essential to our job market. In the usual release case, one tortfeasor is seeking to benefit from a release given to a co-tortfeasor. Because the release before us serves an entirely different purpose than the ordinary release concerning a completed tort, we hold that the release did not need to identify Smith with particularity and that it extended to him. For the same reasons, the release is not subject to the general rule, applicable to completed actions in the past, that "a release covers only claims in existence or being urged at the time it is delivered." *See Johnson v. J.M. Huber Corp.*, 699 S.W.2d 879, 883 (Tex.App.—Amarillo 1985, writ ref'd n.r.e.); *Berry v. Guyer*, 482 S.W.2d 719, 720 (Tex.Civ.App.—Houston [14th Dist.] 1972, writ ref'd n.r.e.).

To summarize, we hold that (1) consent absolutely bars a defamation suit; (2) the authorization signed by Holley is worded broadly enough to cover defamation and it immunized Smith from liability for the statements he made; and (3) a consent instrument need not specifically name in advance the persons released. We sustain Smith's first point of error, reverse the judgment against him, and render judgment that Holley take nothing.