# Supreme Court of Texas

No. 21-0496

Houston Area Safety Council, Inc. and

Psychemedics Corporation,

*Petitioners*,

v.

Guillermo M. Mendez,

*Respondent*

On Petition for Review from the
Court of Appeals for the First District of Texas

JUSTICE BOYD, joined by Justice Lehrmann and Justice Devine, dissenting.

To its credit, this Court does not take lightly a request to recognize a common-law duty. For the most part, at least in recent years, we have viewed the common law as sufficiently developed to address those circumstances in which parties owe legal duties to each other and those in which they don't. *See, e.g., Elephant Ins. Co. v. Kenyon*, 644 S.W.3d 137, 150–51 (Tex. 2022); *Pagayon v. Exxon Mobil Corp.*, 536 S.W.3d 499, 507–08 (Tex. 2017). Yet we have not rejected our longstanding recognition that "changing social standards and increasing

complexities of human relationships in today's society" may "justify imposing a duty" the common law has not previously imposed. *Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 310 (Tex. 1983). It remains true today that, because our society and its standards are constantly changing, "the common law is not frozen or stagnant, but evolving, and it is the duty of this court to recognize the evolution." *El Chico Corp. v. Poole*, 732 S.W.2d 306, 310 (Tex. 1987) (citing *Otis Eng'g*, 668 S.W.2d at 310); *see also Tex. Mut. Ins. Co. v. Ruttiger*, 381 S.W.3d 430, 457 (Tex. 2012) (Willett, J., concurring) ("[W]e are called upon to reevaluate common-law rules, giving deference to *stare decisis* when warranted, but departing when the prior rule no longer furthers the interests of efficiency, fairness, and legitimacy.").

We are asked in this case whether entities an employer hires to collect and test an employee's biological samples for drug-testing purposes owe a legal duty to the employee to act reasonably in the performance of those limited services. As the Court explains, we have not previously addressed this question.[1] To ensure consistency,

---

[1] *Ante* at ___. We held in *SmithKline Beecham Corp. v. Doe*, 903 S.W.2d 347 (Tex. 1995), that an independent drug-testing laboratory did not owe "a person tested a duty to tell that person or the employer that ingestion of certain substances will cause a positive test result," *id.* at 348, but we expressly "emphasiz[ed]" in that case that we were not considering "whether a drug testing laboratory . . . has a duty to use reasonable care in performing tests and reporting the results," *id.* at 355. And we held in *Mission Petroleum Carriers, Inc. v. Solomon*, 106 S.W.3d 710 (Tex. 2003), that an employer did not owe a "duty to an at-will employee to use reasonable care when collecting an employee's urine sample for drug testing pursuant to DOT regulations," *id.* at 710, but we again emphasized that the question of whether a third-party entity that collects employees' samples owes a duty of care to the employees was "not before [the] Court," *id.* at 711.

2

predictability, and public confidence in the law and in this Court's role in its development, we cannot address the issue by relying on our own personal, subjective views of whether a particular party should face the possibility of liability in particular circumstances, or even of what the law "should" be. Instead, our analysis must adhere to well-established considerations that have long guided and constrained this Court's role as guardian of the common law.

The parties here agree we should focus on such well-established considerations in this case, specifically—as explained below—on (1) the social, economic, and political questions the proposed duty presents, and (2) the laws and policies not only of this State, but of other states and of the United States. Guillermo Mendez, who urges us to recognize the proposed duty, does not argue that we have previously recognized the duty or that the duty falls within some general negligence duty owed by all. The Houston Area Safety Council and Psychemedics, who oppose the proposed duty, do not argue that we should abandon or revisit those well-established considerations.[2] The Court thus properly limits its analysis to the arguments the parties have presented. But because I conclude the analysis necessarily leads directly to a recognition of the common-law duty proposed in this case, I must respectfully dissent.

---

[2] In the trial court, the Safety Council and Psychemedics argued that Mendez could not establish any of the elements of a negligence claim: duty, breach, causation, or damages. The trial court granted summary judgment only on the ground that Petitioners did not owe Mendez a legal duty. The court of appeals held that Petitioners did owe Mendez a duty, and it remanded the case to the trial court without addressing breach, causation, or damages. *See* 634 S.W.3d 154, 163 (Tex. App.—Houston [1st Dist.] 2021). I too would address only the duty question and leave it to the trial court to consider the other elements in the first instance on remand.

## A. Social, economic, and political concerns

Our precedent first requires us to "weigh the 'social, economic, and political questions and their application to the facts at hand' to determine whether a duty exists and what it is." *Elephant Ins.*, 644 S.W.3d at 145 (quoting *Humble Sand & Gravel v. Gomez*, 146 S.W.3d 170, 182 (Tex. 2004)). We do this by considering several factors— commonly referred to as the *Phillips* factors[3]—balancing "the risk, foreseeability, and likelihood of injury" against the "social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, the consequences of placing the burden on the defendant," and considering "whether one party would generally have superior knowledge of the risk or a right to control the actor who caused the harm." *Id.* (quoting *Humble Sand & Gravel*, 146 S.W.3d at 182).[4] In this case, these factors weigh heavily in favor of recognizing the duty Mendez proposes.

### 1. Risk of injury

As the Court concedes, we have previously recognized the "serious risk that an employee can be harmed by a false positive drug test." *Ante* at \_\_\_ (quoting *Mission Petroleum*, 106 S.W.3d at 714–15). Other state supreme courts around the country have recognized it as well. *See, e.g.*,

---

[3] *See Greater Hous. Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990).

[4] *See also Pagayon*, 536 S.W.3d at 504; *Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 410 (Tex. 2009); *New Tex. Auto Auction Servs., L.P. v. Gomez De Hernandez*, 249 S.W.3d 400, 406 (Tex. 2008); *Golden Spread Council, Inc. No. 562 of Boy Scouts of Am. v. Akins*, 926 S.W.2d 287, 289–90 (Tex. 1996); *Graff v. Beard*, 858 S.W.2d 918, 920 (Tex. 1993); *Phillips*, 801 S.W.2d at 525.

4

*Shaw v. Psychemedics Corp.*, 826 S.E.2d 281, 284 (S.C. 2019) (noting that the "risk is especially great in at-will [employment] states"); *Landon v. Kroll Lab'y Specialists, Inc.*, 999 N.E.2d 1121, 1122 (N.Y. 2013) (noting the "profound, potentially life-altering, consequences" of the drug-testing company's actions); *Berry v. Nat'l Med. Servs., Inc.*, 257 P.3d 287, 291 (Kan. 2011) (observing that "inaccurately reported test results can have dire consequences on the livelihood of individuals"); *Duncan v. Afton, Inc.*, 991 P.2d 739, 745 (Wyo. 1999) (noting the testing company "is aware that the likely effect of a false positive result is significant and devastating"). Indeed, as the Court explains, Mendez testified that he was barred from the jobsite after his positive test results, and a second positive result would prevent him from working in his profession at all. *Ante* at ___.[5]

The Court concludes, however, that—similar to the U.S. Department of Transportation regulations that applied to the trucking-company employer in *Mission Petroleum*—Petitioners' internal procedures and licensing and certification requirements substantially mitigate the risks, and even make them "essentially non-existent." *Ante* at ___ (describing Psychemedics' chain-of-custody reviews, verification reviews, opportunities to explain positive results and take a second test,

---

[5] The Safety Council and Psychemedics contend that the positive result of Mendez's first test could not have caused Mendez to lose his job at Turnaround Welding Services because he quickly retested negative and completed other requirements, and Turnaround's decision not to reassign Mendez to Valero or another job site cannot be attributed to the initial positive test result. This argument, however, addresses the issue of whether Petitioners' conduct proximately caused Mendez's alleged damages, not whether they owed Mendez a legal duty.

and washing and testing procedures, which governmental agencies "have evaluated and approved").

In the most important respects, however, Petitioners have not shown that their procedures provide the kinds of protections we considered important in *Mission Petroleum*. There we noted not only that federal DOT regulations (as opposed to the entities' own internal procedures) required the types of protections the Court recites, but also that they grant employees the right to complain and initiate administrative proceedings to challenge those procedures. *Mission Petroleum*, 106 S.W.3d at 714–15. Importantly, we noted that the DOT regulations grant the Federal Highway Administration authority to investigate alleged violations, "compel compliance, assess civil penalties, or both," and "fashion relief to the complainant and 'assure that the complainant is not subject to harassment, intimidation, disciplinary action, discrimination, or financial loss' for having filed the complaint." *Id.* at 714 (quoting 49 C.F.R. § 386.12). These remedies, we concluded, sufficiently enable employees to "protect themselves from harm," without merely relying on the employer to comply with its internal procedures. *Id.*

Unlike the employer in *Mission Petroleum*, the Safety Council and Psychemedics have not pointed us to any governmental or external regulatory scheme that provides meaningful remedies on which employees may rely to prevent and mitigate the harm that foreseeably occurs when a drug-collection or drug-testing company negligently fails to comply with its internal procedures or regulatory mandates. And as we noted in *Mission Petroleum*, "[w]ithout these protections, the risk of

6

harm resulting from a negligently conducted urinalysis test would be great." *Id.* at 715. Because those protections do not exist for those whose samples are collected and tested by third parties, rather than a DOT-regulated employer, this factor weighs heavily in favor of recognizing the proposed duty.

### 2. Foreseeability and likelihood of injury

The Court merely "assume[s] that there is a significant likelihood that Petitioners could and did foresee the injury" Mendez suffered as a result of his positive drug test. *Ante* at ___. As its subsequent discussion reveals, however, we need not rely on an assumption to reach that conclusion. The specimen-custody-and-control form and the test-results report confirm that the Safety Council and Psychemedics knew that Mendez was being tested for employment purposes, so they cannot dispute that they could foresee that a positive test would cause Mendez economic harm. Like the risk factor, the foreseeability factor, which we have described as the "foremost and dominant consideration," *Phillips*, 801 S.W.2d at 525 (quoting *Poole*, 732 S.W.2d at 311), weighs heavily in favor of recognizing the proposed duty.

### 3. Social utility of drug testing

We must next balance the substantial risk, foreseeability, and likelihood of injury against the social utility of the Petitioners' services. *See Elephant Ins.*, 644 S.W.3d at 145. I agree with the Court that "[t]here is great social utility in drug testing employees, particularly those engaged in occupations that present substantial dangers to themselves, other employees, property, and the public." *Ante* at ___. But the value of drug testing is only as great as the accuracy and reliability

7

of the tests' results. As the South Carolina Supreme Court has observed, the "*significant* public interest" is "in ensuring *accurate* drug tests because countless employees are required to undergo drug testing as a condition of their employment." *Shaw*, 826 S.E.2d at 283 (emphases added). Because the social utility of employee drug testing is *only* as significant as the accuracy of that testing, this factor bears little weight against the recognition of a duty to act reasonably to ensure such accuracy.

### 4. Burden and consequences

In addition to the social utility, we must also consider the burden Petitioners would bear to guard against the foreseeable injury and the consequences of placing that burden on them. *See Elephant Ins.*, 644 S.W.3d at 145. The Court concludes that the burden and consequences would be great because Petitioners "contend" that recognition of the duty "will produce a flood of frivolous and burdensome claims against [third-party facilities] for every employee who receives a positive test result," leading them to insist on indemnity agreements with their customers, increase their prices, or cease drug testing altogether. *Ante* at ___.

I agree we must carefully consider such consequences and give them great weight when they in fact exist. But Petitioners have failed to provide any evidence to support these contentions. As discussed below, several other states have recognized the proposed duty for twenty-odd years, and Petitioners have not suggested that any significant burden or parade of horribles has in fact occurred in those jurisdictions. Absent such evidence, we can only assume that Petitioners

8

and others like them have been able to comply with the duty of "ordinary care" in these other states, and they have offered no argument that they have faced a barrage of frivolous claims in those states.

Psychemedics, in fact, vigorously contends that Mendez's proposed duty is completely unnecessary because its testing procedures are essentially infallible, "there are no false positives with hair testing," it has "never had a false positive," and in over nine million tests, an error has "never happened." But accepting the truth of these contentions, our recognition of the proposed duty will impose no more than a minimal burden because Psychemedics will never breach the duty. Psychemedics expresses fear that the duty's mere existence will produce a wave of frivolous and burdensome claims, but our laws provide substantial protections, disincentives, and remedies against such claims.

The Court also accepts Petitioners' suggestion that recognizing the proposed duty would "erode the at-will employment doctrine" because, "[i]f third-party entities can be liable for negligently collecting and testing employee drug samples, then employers who themselves collect or test such samples will ultimately face the same liabilities." *Ante* at ___. But we already addressed that issue in *Mission Petroleum*, refusing to recognize the duty as to *employers* who collect or test their own employees' drug samples, in part because the duty could undermine Texas's fundamental at-will-employment doctrine because the employee's claim concerned "the process by which [his employer] chose to terminate him." 106 S.W.3d at 715.[6] Even if we were to someday

---

[6] Relatedly, the Court also contends that recognizing a duty in this case would be inconsistent with Texas law because, in the context of defamation

9

reconsider that reasoning (which no one here argues we should), our decision would (or, at least, should) be the result of our careful consideration of the well-established fundamental principles that govern our analysis, not a "consequence" of our decision in this distinguishable case.

## 5. Superior knowledge of risk and right to control

Our analysis of the social, economic, and political questions also requires us to consider which of the parties has superior knowledge of the risks and a superior ability to control those whose conduct may create those risks. *See Elephant Ins.*, 644 S.W.3d at 145. Undoubtedly,

---

claims, "Texas law recognizes a 'qualified privilege' that 'protects a former employer's statements about a former employee to a prospective employer.'" *Ante* at ___ (quoting *Smith v. Holley*, 827 S.W.2d 433, 436 (Tex. App.—San Antonio 1992, writ denied)). Setting aside the Court's conflation of legal duties and privileges, the privilege on which the Court relies exists to protect the free-speech rights of those who may be responsible for the "honest communication of misinformation," not the free-*conduct* rights of those whose affirmative actions cause the information to be incorrect. *Pioneer Concrete of Tex., Inc. v. Allen*, 858 S.W.2d 47, 50 (Tex. App.—Houston [14th Dist.] 1993, writ denied) (quoting *Kaplan v. Goodfried*, 497 S.W.2d 101, 105 (Tex. App.—Dallas 1973, no writ). The privilege might provide a proper analogy if Mendez were suing the Safety Council and Psychemedics for falsely communicating that Mendez had tested positive for drugs, but that of course is not Mendez's claim. According to Psychemedics, Mendez in fact did test positive for drugs, but according to Mendez, he did so only because the Safety Council negligently collected his sample or Psychemedics negligently performed the test. Texas law has never recognized a qualified privilege to protect against negligent conduct in any similar circumstances. Nor does the Court's reliance on the economic-loss rule justify its reasoning in this case. *See ante* at ___ (citing *LAN/STV v. Martin K. Eby Constr. Co.*, 435 S.W.3d 234 (Tex. 2014)). The lost wages Mendez seeks to recover constitute losses directly resulting from injury to him personally, not a "standalone economic loss" that resulted from "bodily harm to another or from physical damage to property in which he has no proprietary interest." *LAN/STV*, 435 S.W.3d at 238–39.

Petitioners have far more knowledge of the specimen-collection and -testing processes than the employees whose specimens are collected and tested, and they are in a far better position to ensure that they act reasonably and use ordinary care when they engage in such activities. *See Landon*, 999 N.E.2d at 1124 ("The laboratory is . . . in the best position to prevent false positive results.").

The Court finds it relevant, however, that Petitioners have no control over how an employer responds to a positive drug test and thus have no control over the harm the employee suffers as a result of that test. *See ante* at ___. But this concern relates to the question of whether a third-party company's negligent handling of an employee's sample proximately caused the employee's harm—an issue we do not address in this case. Of course, there "may be more than one proximate cause of an injury," and "a defendant's act or omission need not be the sole cause of an injury, as long as it is a substantial factor in bringing about the injury." *Bustamante v. Ponte*, 529 S.W.3d 447, 457 (Tex. 2017). Even if an employer's reaction to a false-positive drug test is a proximate cause of the employee's injury, any negligent conduct by an outside entity that produced the false positive also proximately caused the injury. The fact that the outside entity's negligence may not be the sole proximate cause does not weigh against recognition of a duty to protect against such negligence.

The Court also suggests that entities like Petitioners lack knowledge or control because they have no "direct relationship with an employee whose samples they collect and test." *Ante* at ___; *see Mission Petroleum*, 106 S.W.3d at 710–11 (noting that Texas courts had rejected

11

a laboratory's duty of care because "drug-testing companies have a direct relationship only with the employer and not the employee"). But we have never required any contractual or other privity as a prerequisite to a negligence duty, and we may recognize such a duty under the *Phillips* factors even in the absence of a previously recognized "special relationship." *See Golden Spread Council*, 926 S.W.2d at 292. An entity that collects or tests a client's employees' drug-test samples undeniably has a direct relationship with the samples themselves, and the duty Mendez proposes derives only from *that* relationship. Mendez does not propose a duty to the employee beyond the duty to act reasonably with regard to the entity's relationship with the employee's drug-testing sample.

In sum, I conclude that entities like Petitioners have superior knowledge of the risks and control over those whose conduct may create such risks. This factor, along with the significant risk, foreseeability, and likelihood of injury, substantially outweighs the impact that recognition of the proposed duty would have on the social utility of drug testing and the burdens and consequences the duty would place on such entities.

## B. Decisions of other jurisdictions

When deciding whether to recognize a common-law duty we also "take into account not only the law and policies of this State, but the law of other states and the United States, and the views of respected and authoritative restatements and commentators." *SmithKline*, 903 S.W.2d at 351. The Court correctly observes that some "[l]ower courts around the country have split over the issue of whether third-party companies

12

owe a common-law duty to their clients' employees to use reasonable care in collecting and testing their drug-testing samples." *Ante* at ___. But it ignores the fact that the "overwhelming majority" of courts that have addressed the issue have recognized such a duty, reflecting an "overall trend" throughout our nation's courts. *See Quisenberry v. Compass Vision, Inc.*, 618 F. Supp. 2d 1223, 1228 (S.D. Cal. 2007) (collecting cases); *see also Cooper v. Lab'y Corp. of Am. Holdings, Inc.*, 150 F.3d 376, 379–80 (4th Cir. 1998) (same).

This is particularly true when we consider decisions of the state courts of last resort. Only five of the highest state courts have addressed the issue—South Carolina, New York, Kansas, Pennsylvania, and Wyoming—but *all of them* have recognized the proposed duty's existence under common-law negligence principles. *See Shaw*, 826 S.E.2d at 282 (holding that under South Carolina law "a drug testing laboratory that has a contract with an employer to conduct and evaluate drug tests owe[s] a duty of care to the employees who are subject to the testing so as to give rise to a cause of action for negligence for failure to properly and accurately perform the test and report the results"); *Landon*, 999 N.E.2d at 1124 (holding that under New York law a testing laboratory owed a negligence duty to a probationer who was required to participate in drug testing as a condition of probation); *Berry*, 257 P.3d at 291 (holding that under Kansas law companies that collected and tested urine samples owed a negligence duty to an employee who provided sample); *Sharpe v. St. Luke's Hosp.*, 821 A.2d 1215, 1221 (Pa. 2003) (holding under Pennsylvania law that a hospital that collected drug-testing samples under contract with an employer owed a negligence duty

13

to an employee who submitted samples); *Duncan*, 991 P.2d at 740 (holding that a Wyoming company hired by the employer to collect urine samples from employees owed a negligence duty to employees "when collecting, handling, and processing urine specimens for the purpose of performing substance abuse testing").

As the Court notes, shortly before we issued our decision in *SmithKline*, the United States Court of Appeals for the Fifth Circuit held that, under Texas law, an independent laboratory *did* owe a "duty to testees to use reasonable care in conducting its tests." *Willis v. Roche Biomed. Lab'ys, Inc.*, 21 F.3d 1368, 1372 (5th Cir. 1994), *opinion withdrawn and superseded*, 61 F.3d 313 (5th Cir. 1995). In making that "*Erie* guess," the court relied primarily on the Texas court of appeals' decision in *SmithKline*, despite the fact that *SmithKline* involved a proposed duty to warn against ingesting poppy seeds and not a proposed duty to use reasonable care in conducting the tests, and (as we noted in our decision in *SmithKline*) despite the fact that we had already granted review of the Texas court of appeals' decision in that case. *See id.* at 1372–73.

After we decided *SmithKline*, however, the Fifth Circuit panel withdrew its opinion and changed its holding. *See Willis v. Roche Biomed. Lab'ys, Inc.*, 61 F.3d 313, 313 (5th Cir. 1995). In its new opinion, the panel made an *Erie* guess that, under Texas law, a laboratory does *not* owe a legal duty "to persons tested to perform its services with reasonable care." *Id.* at 316. The court acknowledged our recognition in *SmithKline* that "some jurisdictions had held that a laboratory owes a duty to persons tested to perform its services with reasonable care," and

14

that we distinguished those decisions "from the failure to warn claims" at issue in *SmithKline. Id.* Nevertheless, the panel concluded that our opinion in *SmithKline* "*seemed* to question the soundness of the decisions finding such a duty," particularly by making "unfavorable references" to the panel's original decision. *Id.* at 316 & n.2 (emphasis added). Although we had emphasized in *SmithKline* that we were not addressing "whether a drug testing laboratory . . . has a duty to use reasonable care in performing tests and reporting the results," 903 S.W.2d at 355, the Fifth Circuit panel nevertheless relied on our opinion to conclude that, under Texas law, the laboratory owed the employee "no duty of reasonable care in testing his urine for drugs," *Willis*, 61 F.3d at 316.

As a result, the Fifth Circuit and its district courts have followed *Willis*'s holding, repeating that, under Texas law, an independent laboratory does not have a legal duty to a person whose specimens are tested to exercise reasonable care when conducting those tests. *See, e.g.*, *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 730 (5th Cir. 2002); *Brownlow v. Lab'y Corp. of Am.*, 254 F.3d 1081, 1081 (5th Cir. 2001); *Martinez v. DISA, Inc.*, 435 F. Supp. 3d 747, 753 (W.D. Tex. 2020); *Hinds v. Baker Hughes, Inc.*, No. MO-06-CV-134, 2007 WL 9710941, at *3 (W.D. Tex. Sept. 28, 2007); *Frank v. Delta Airlines, Inc.*, No. CIV.A. 3:00-CV-2772, 2001 WL 910386, at *2 (N.D. Tex. Aug. 3, 2001). All of these courts, however, simply followed *Willis*, which in turn relied solely on *SmithKline*, which did not address the issue; and none of them considered the *Phillips* factors or conducted any other analysis of the policy issues underlying their holdings.

15

Although the Court does not perceive a national "consensus" on the issue, *ante* at ___, the decisions of our sister states' highest courts reflect the "changing social standards and increasing complexities of human relationships in today's society" that "justify imposing" the duty Mendez proposes. *Otis Eng'g*, 668 S.W.2d at 310. And, I must respectfully (yet regretfully) add, they reflect a far deeper analysis of the issue than the cursory review this Court applies today.

### Conclusion

This Court has "consistently made changes in the common law of torts as the need arose in a changing society." *Poole*, 732 S.W.2d at 311. When prevailing norms favor a change in the law, it is this Court's duty to recognize the tidal shift. *See Sanchez v. Schindler*, 651 S.W.2d 249, 251–52 (Tex. 1983) (stating that the Court should, "in light of present social realities," reconsider policy and "act in response to the needs of a modern society"). In the absence of protections of substantial statutory or regulatory schemes, employees subject to employment-related drug testing have no protection against negligently produced false positives. Applying our well-established guiding principles, I would hold that third-party entities that collect and test samples submitted by those employees owe the employees a common-law duty to act reasonably with regard to their handling of the samples. Because I would affirm the court of appeals' judgment and remand the case to the trial court for further proceedings, I respectfully dissent.


_____
Jeffrey S. Boyd
Justice


16

**OPINION FILED:** June 23, 2023